639 So.2d 909 (1994)
James Michael HEMSLEY,
v.
Elizabeth M. HEMSLEY.
No. 92-CA-00423.
Supreme Court of Mississippi.
July 7, 1994.
*910 William P. Featherston, Jr., Ridgeland, for appellant.
B. Ruth Johnson, Jackson, for appellee.
En Banc.

STATEMENT OF THE CASE
PITTMAN, Justice, for the Court:
Elizabeth M. Hemsley (Bitsy) filed a complaint for divorce against James M. Hemsley (Mike) on April 4, 1991, alleging as grounds for divorce, inter alia, irreconcilable differences pursuant to Miss. Code Ann. § 93-5-2 (Supp. 1992). On January 10, 1992, Mike and Bitsy filed a consent in writing, signed by both parties, for the court to resolve the questions of alimony and property rights, including the payment of attorney's fees and costs. The lower court awarded Bitsy $1,400.00 per month in permanent, periodic alimony, and 50% of Mike's military and civil service retirement benefits, and further ordered Mike to pay 50% of Bitsy's attorney's fees in the amount of $2,820.59. Feeling aggrieved, Mike filed this appeal assigning the following errors:
I. THE COURT ERRED BY AWARDING ALIMONY TO ELIZABETH M. HEMSLEY OR, IN THE ALTERNATIVE, IN AWARDING AN AMOUNT OF ALIMONY WHICH WAS MORE THAN JAMES MICHAEL HEMSLEY COULD AFFORD TO PAY.
II. THE COURT ERRED IN AWARDING FIFTY (50%) PERCENT OF JAMES MICHAEL HEMSLEY'S MILITARY RETIREMENT BENEFITS AND CIVIL SERVICE RETIREMENT BENEFITS TO ELIZABETH M. HEMSLEY.
III. THE COURT ERRED BY ORDERING JAMES MICHAEL HEMSLEY TO PAY ONE-HALF (1/2) OF ELIZABETH M. HEMSLEY'S ATTORNEY'S FEES WHEN ELIZABETH M. HEMSLEY HAD A SEPARATE ESTATE SUFFICIENT TO PAY HER ATTORNEY'S FEES.

STATEMENT OF FACTS
Bitsy and Mike were married on June 18, 1966, in Baltimore, Maryland. During their *911 marriage, two children were born, James Michael Hemsley, Jr., born February 15, 1969, and Bonnie Jean Hemsley, born December 13, 1970. The couple lived in many different localities because Mike was a member of the Armed Forces. In 1983, the couple moved to Mississippi where they resided until their separation on April 4, 1991.
At the time of trial, Bitsy was 48 years old. During their marriage, Bitsy worked either part-time or full-time in order to help support the family. She had a high school education and was attending classes in business administration at Hinds Community College. At the time of trial, she was employed as a secretary. In 1990, Bitsy earned approximately $21,678.00, and in 1991, she earned $21,900.00. Bitsy estimated that both figures included $2,000 in overtime.
Bitsy testified that she has suffered from a heart condition for 21 years and needs medication, Lanoxin and Inderal, costing approximately $150.00 per month. The condition, arrhythmia, occurred as a result of her pregnancy with Bonnie in 1970. She also suffered from chronic sinus problems which required surgery four years prior to trial. She testified that she had to take Humibid to control her sinus problems. She further stated that she suffers from diverticulitis and chronic yeast infections. Finally, she testified that Mike exposed her to herpes. Although she has not tested positive for herpes, her doctor told her that it could occur at any time.
Mike was 47 years old at the time of trial and was a member of the Army until 1977. His only health complaint was an elevated cholesterol level which was being treated by medication. Mike obtained a bachelor's degree in engineering in 1966. He was an engineer officer with the Army from 1966 to 1977. While he was with the Army, Mike went to school at night and obtained a master's degree in harbor, coastal and ocean engineering. After leaving the Army, Mike took a job with his brother's engineering firm for a three year period. In 1980, he returned to the federal government as a civilian employee. Since that time, with the exception of a six-month period where he worked for the Department of the Army, Mike has worked either for the Corps of Engineers or for the National Oceanic and Atmospheric Administration. He was also a member of the Army Reserve. At the time of trial, he was working as a coastal/ocean engineer and his job title was Supervisory General Engineer.
Both Mike, Jr., and Bonnie were over the age of 21 years at the time of trial. Mike, Jr., lacked one or two years in obtaining a chemical engineering degree at Mississippi State University and Bonnie was contemplating law school. Mike and Bitsy both expressed a desire to help their children complete their education by providing financial support.
Mike and Bitsy separated on April 4, 1991. Bitsy filed a complaint for divorce alleging, inter alia, irreconcilable differences. Mike and Bitsy consented to a divorce on the ground of irreconcilable differences and requested that the lower court resolve the following issues:
(1) Custody, maintenance and college expenses of the minor child of the parties;
(2) Lump sum alimony;
(3) Periodic alimony;
(4) Settlement of any property rights, including but not limited to division of personalty and division of retirement benefits, both civil and military;
(5) Premium payment and maintenance of hospitalization, medical, dental, accident and health insurance policies;
(6) Maintenance of life insurance;
(7) Propriety and imposition of liens or other orders to secure payment of any award by Court;
(8) Payments of debts; and
(9) Payment of attorney's fees.
After reviewing the testimony of the parties and the financial information they provided, the lower court awarded Bitsy $1,400.00 per month in permanent, periodic alimony, 50% of Mike's military retirement, and 50% of Mike's civil service retirement as of the date of judgment. The lower court also awarded Bitsy 50% of her attorney's fees which amounted to $2,820.59. Finding no error in the chancellor's award of periodic *912 alimony, retirement benefits and attorney's fees, we affirm. Bracey v. Bracey, 408 So.2d 1387 (Miss. 1982); Savell v. Savell, 290 So.2d 621 (Miss. 1974); See Miss. Code Ann. § 93-5-23." Colvin v. Colvin, 487 So.2d 840, 841 (Miss. 1986).

LAW

I. THE COURT ERRED BY AWARDING ALIMONY TO ELIZABETH M. HEMSLEY OR, IN THE ALTERNATIVE, IN AWARDING AN AMOUNT OF ALIMONY WHICH WAS MORE THAN JAMES MICHAEL HEMSLEY COULD AFFORD TO PAY.
Mike contends that the lower court lacked the statutory authority to award periodic alimony, or in the alternative, that the amount of periodic alimony awarded was excessive. According to Mike, lump sum alimony is a division of property and would have been within the statutory authority of the lower court, whereas periodic alimony is considered spousal support and is not a division of property. Mike argues that periodic alimony is not specifically provided for in § 93-5-2(3) and further that in Kergosien v. Kergosien, 471 So.2d 1206 (Miss. 1985), this Court held that "[d]ivorce is a creature of statute; it is not a gift to be bestowed by the chancellor.... It is a statutory act and the statutes must be strictly followed as they are in derogation of the common law." Id. at 1210.
Mike also argues that his consent to allow the chancellor to decide the issue of periodic alimony does not confer subject matter jurisdiction upon the lower court. "It has been often said that the jurisdiction of courts is such a public matter that it cannot be affected by a private agreement, and that the jurisdiction of a court can therefore neither be acquired nor lost as a result of an agreement of the parties." 20 Am.Jur.2d Courts § 139 (1965).
This Court, however, effectively dealt with this issue in Taylor v. Taylor, 392 So.2d 1145 (Miss. 1981).
A scrutiny of Section 93-5-2 reveals that it does not literally use the word "alimony", but rather speaks in direct terms only to "sufficient provision by written agreement" for the maintenance of children of the marriage and "for the settlement of any property rights between the parties." ... It could be argued that the legislature did not intend any alimony in divorces based upon irreconcilable differences but only intended adequate provision for the minor children of the parties as well as an adjustment of property rights. In our opinion such construction upon the legislative intention would be strained and unrealistic because the question of alimony normally arises in a great majority of divorce suits, a factor of which the legislature was undoubtedly aware at the time the statute was passed. To so construe the legislature's intent would limit the application of the irreconcilable differences statute to the wealthy few with sufficient property for division between themselves for their maintenance without the necessity of considering alimony and its obligations. We are of the opinion the legislature did not intend this result and in its wisdom enacted the statute for the benefit of all the citizens, including those without property or sufficient wealth for a lump sum alimony settlement; for after all they, on occasion, also have irreconcilable differences to arise.
Id. at 1148. Thus, Mike's argument that the lower court did not have the authority to award periodic alimony is without merit.
In the alternative, Mike contends that the award of periodic alimony in the amount of $1,400.00 per month was excessive. In determining a reasonable award for alimony, the following factors should be considered:
(1) the health of the husband and his earning capacity;
(2) the health of the wife and her earning capacity;
(3) the entire sources of income of both parties;
(4) the reasonable needs of the wife;
(5) the reasonable needs of the child;
(6) the necessary living expenses of the husband;
(7) the estimated amount of income taxes the respective parties must pay on their incomes;

*913 (8) the fact that the wife has the free use of the home, furnishings and automobile, and
(9) such other facts and circumstances bearing on the subject that might be shown by the evidence.
Brabham v. Brabham, 226 Miss. 165, 84 So.2d 147, 153 (1955).
Bitsy introduced Exhibit 5, which indicated that her gross pay totaled $2,042.50 per month, giving her an annual gross of $24,510.00. Her only source of income came from her secretarial job. At the time of trial, Bitsy was attending classes in business administration at Hinds Community College. Bitsy suffers from a heart condition called arrhythmia, and chronic sinus problems requiring medication of approximately $150.00 per month.
Bitsy listed her expenses of $2,920.00 per month in Exhibit 5. With her net income amounting to $1,540.39 per month and alimony in the amount of $1,400.00 per month before taxes, Bitsy will not be able to meet her monthly expenses.
Mike testified that he was in good health with the exception of an elevated cholesterol level, which was being treated with medication. He had a master's degree in harbor, coastal and ocean engineering. Mike introduced an exhibit indicating that he grossed $5,308.17 per month from his job. He also had other sources of income totalling $450.84 per month. His total gross income per month totaled $5,759.01. (The total on Exhibit 3 of $5,601.04 failed to take into account the $157.97 per month received from the Army Reserves.) Thus, Mike's gross income for the year totaled $69,108.12.
Mike listed his expenses in Exhibit 3 which totaled $3,687.96 per month. (The figure listed of $4,387.96 includes $700.00 of temporary alimony. The temporary and periodic alimony are not being considered at this time.) Mike estimated that his net income per month only totaled $3,760.23. Thus, without considering alimony of any type, Mike has only $72.27 left after paying all of his expenses.
A careful review of both Mike and Bitsy's expenses reveal that some items may be overstated and inflated. Basically, Mike will have net income of $4,000.00 per month and he will have approximately $2,600.00 per month to pay for expenses after he pays Bitsy $1,400.00 in alimony. Bitsy will also have approximately $2,940.00 per month (net pay of $1,540.00 plus $1,400.00 in alimony less taxes applicable to the alimony) to pay for her expenses. A review of the record does not indicate any reason why Mike's expenses should be more than Bitsy's expenses, especially given Bitsy's medical condition. The chancellor did not abuse his discretion in awarding Bitsy $1,400.00 per month in alimony.

II. THE COURT ERRED IN AWARDING FIFTY (50%) PERCENT OF JAMES MICHAEL HEMSLEY'S MILITARY RETIREMENT BENEFITS AND CIVIL SERVICE RETIREMENT BENEFITS TO ELIZABETH M. HEMSLEY.
Mike contends that Bitsy has no property right in his military retirement pay and that it can only be considered as part of the income stream available to divorcing spouses when the chancellor determines the amount of alimony to award.
Bitsy, however, maintains that the lower court did have the authority to make an equitable division of Mike's military and civil service retirement benefits. The federal government has vested state courts with the power to allocate military retirement pay pursuant to a divorce decree. 10 U.S.C. § 1408(c)(1) (Supp. 1992). See Powers v. Powers, 465 So.2d 1036, 1037 (Miss. 1985) (state courts in Mississippi have power to allocate military retirement pay pursuant to divorce decree). A spouse who has made a material contribution toward the acquisition of an asset titled in the name of the other may claim an equitable interest in such jointly accumulated property. Jones v. Jones, 532 So.2d 574, 580-81 (Miss. 1988). See also White v. White, 557 So.2d 480, 484 (Miss. 1989); Johnson v. Johnson, 550 So.2d 416, 420 (Miss. 1989).
In the case sub judice the chancellor's findings of fact in part held:

*914 The wife contributed her share by rocking the cradle, keeping the house, and caring for the children. Although the husband was bringing in the income, still marriage is pretty much a 50/50 partnership as to property acquired during the marriage regardless of the role played by the parties. Certainly we recognize that Mississippi is not a community property state, but many of our cases indicate that the Court still should make an equitable division of the property acquired during the marital relationship. Equity means equal fairness. (emphasis added).
In addition the opinion stated:
The Court feels that it would be grossly unfair to allow the defendant to divorce his wife and either remarry or allow some other woman to reap the benefits of the plan acquired during the best years of their life. He should not live in comfort while the ex-spouse becomes destitute. So it would seem in equity that the retirement benefits should be for the marriage and not for either individual party to the marriage and, also, to some degree, the children until they reach their majority.
There is a distinction between alimony and retirement benefits. In Brown v. Brown, 574 So.2d 688 (Miss. 1990), this Court noted that the Federal Uniformed Services Former Spouses Protection Act, 10 U.S.C. § 1408 (hereinafter FUSFSPA), "allowed the states to treat the military retirement pensions of their domiciliaries as personal property subject to state property laws." Brown, 574 So.2d at 690. In reference to a spouse's equitable right to a share of the other spouse's military retirement pay, this Court reiterated that a chancery court has authority, where equity so demands, to order a fair division of property accumulated through the joint contributions and efforts of the parties. Brown, 574 So.2d at 690. See also Brendel v. Brendel, 566 So.2d 1269, 1273 (Miss. 1990); Jones v. Jones, 532 So.2d 574, 580-81 (Miss. 1988); Regan v. Regan, 507 So.2d 54, 56 (Miss. 1987); Watts v. Watts, 466 So.2d 889, 891 (Miss. 1985); Clark v. Clark, 293 So.2d 447, 459 (1974).
Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage.
In Newman v. Newman, 558 So.2d 821 (Miss. 1990), this Court recognized that "a former spouse's rights vel non in his or her former mate's military retirement pension ... is subject to the personal property laws of the states. ..." Id. at 823 (emphasis added). In Southern v. Glenn, 568 So.2d 281 (Miss. 1990), this Court stated that "[a] spouse's military retirement pension is an asset...." Id. at 283 n. 1. The chancellor had the authority to order a fair division of the retirement benefits since they were accumulated through the joint contributions and efforts of the parties. Brown, 574 So.2d at 690.
There are those who would impose "title" absolutes to property acquired during marriage. They would grant almost all property rights based on title or grant almost all property rights to the income earner. This ignores reality. We must recognize that married parties usually create estates together. In 1619 at the first Legislative Assembly in the "new world" the General Assembly of (the colony) Virginia in a petition to the founding company said:
The thirde petition humbly presented by this General assembly to the Treasurer, Counsell, & Company is, that it may plainely be expressed in the great Commission (as indeed it is not) that the antient planters of both sortes, ... and suche also as were brought hither upon the Companies coste, may have their second, third, and more divisions sucessively in as lardge and free manner as any other Planters. Also they wilbe pleased to allowe to the male children of them and of all others begotten in Virginia, being the only hope of a Posterity, a single share a piece, and shares for their wives as for themselves; because that in a newe plantation it is not knowen, whether man or woman be the more necessary. (emphasis added).
John Pory, Proceedings of the General Assembly of Virginia, July 30-August 4, 1619, (W.J. Van Schreeven & G. Reese eds. 1969). *915 Likewise, today in acquiring a marital estate, courts cannot tell who is the most important, the man or the woman. Presently the law often deals with a fiction that the parties are deemed to enter into marriage with two separate estates. Most parties enter into marriage with no estate and proceed to build an estate together. Therefore, in the event of a divorce, there is more often than not one estate. If the breadwinner happens to be the husband and has all property in his name, this serves to relegate the non-bread-winner wife to the equivalent of a maid  and upon division of the marital estate entitled to a minimum wage credit for her homemaking service. We abandon such an approach.
We, today, recognize that marital partners can be equal contributors whether or not they both are at work in the market-place.
We define marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor. We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value.
In arriving at an equitable distribution the chancellor should follow those guidelines as set out in Ferguson v. Ferguson, 639 So.2d 921, decided July 7, 1994. We conclude that the chancellor's award of fifty percent of the retirement benefits was amply supported by the record and the law and that he appropriately recognized both the property and income aspects of this asset.
The chancellor ordered that Bitsy's alimony be reduced by her share of the retirement benefits once Mike started to receive his benefits. The chancellor stated the following:
The Court also recognizes the fact that when the retirement benefits commence to be paid the plaintiff must give the defendant credit on the periodic alimony for all amounts received from the retirement plans. Therefore, the periodic alimony will self-adjust by reducing the amount in proportion to the amount received when the plaintiff commences to receive those benefits or when the defendant retires and no longer has a regular employment income.

III. THE COURT ERRED BY ORDERING JAMES MICHAEL HEMSLEY TO PAY ONE-HALF (1/2) OF ELIZABETH M. HEMSLEY'S ATTORNEY'S FEES WHEN ELIZABETH M. HEMSLEY HAD A SEPARATE ESTATE SUFFICIENT TO PAY HER ATTORNEY'S FEES.
In the present case, Bitsy admitted that she had a savings account with a balance in excess of $9,100.00 which she received as her share of the proceeds from the sale of the marital residence. She admitted that she could pay her attorney's fees out of this account. She also has an annual income over $20,000.00. On redirect, Bitsy testified that she owed her father $1,200.00, and that she was going to have to invade her savings in order to repay the loan. As a result, she would only have $7,800.00 to pay her attorney's fee of $5,641.18. If she is forced to pay the entire amount, her savings would be reduced to $2,158.82.
"Generally the award of attorney's fees in a divorce case is left to the discretion of the trial court." Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss. 1988). See also Holleman v. Holleman, 527 So.2d 90, 95 (Miss. 1988); Carpenter v. Carpenter, 519 So.2d 891, 895 (Miss. 1988); Devereaux, Devereaux, 493 So.2d 1310 (Miss. 1986); McKee v. McKee, 418 So.2d 764, 767 (Miss. 1982). Given the fact that Bitsy's take-home pay and alimony will barely cover her monthly expenses, the chancellor did not err in awarding Bitsy one-half of her attorney's fees.

CONCLUSION
The lower court did have the authority to award periodic alimony, and the lower court did not abuse its discretion in determining the amount of alimony. Furthermore, the award of 50% of Mike's retirement benefits was not error. Finally, the chancellor did *916 not abuse his discretion in awarding attorney's fees.
AFFIRMED.
PRATHER, P.J., and SULLIVAN, BANKS, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
HAWKINS, C.J., concurs in part and dissents in part as to Part II with separate written opinion joined in part by DAN M. LEE, P.J., and McRAE, J.
DAN M. LEE, P.J., dissents with separate written opinion joined by McRAE, J.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J.
HAWKINS, Chief Justice, concurs in part and dissents as to Part II:
While I fully endorse the majority's effort to make fair and adequate provision for the spouse whose life has been permanently changed by a divorce, I must respectfully dissent from the statement of law contained in Part II of the majority opinion.
The day when the sole claim a divorced wife had upon her husband was periodic alimony terminable at his death or her remarriage is, I hope, gone forever. Chancery courts presently have the tool to make adequate, non-terminable provision for the wife by an award of lump sum alimony which can be made payable in fixed installments and a lien placed upon the husband's assets to secure payment. Jones v. Jones, 532 So.2d 574 (Miss. 1988).
I have no difference with the factors Presiding Justice Prather lists for the chancellor to consider in making the lump sum award. Ferguson v. Ferguson, 639 So.2d 921 (1994).
I am disturbed at creating some kind of property right in each spouse in property owned solely by the other simply because of the marriage. Of course, a husband and wife are perfectly free to put all property and assets acquired during their marriage in their joint names. They also ought to be free not to.
Once upon a time, not all that long ago, when a woman married her husband in effect became guardian of her property. Those days of bondage are gone. Art. 4, § 94 Mississippi Constitution. Men and women, whether married or not, have a right to own property in their individual names, to buy and sell as they please, save and except for homestead property. The right to own property is a sacred right. Fitzhugh v. City of Jackson, 132 Miss. 585, 605, 97 So. 190, 192 (1923). I would not diminish that; the majority does.
The majority tells us that property accumulated during the marriage becomes the property of them both. What does this mean? Let us see.
This Court has made it abundantly clear that there is no inhibition whatever in spouses suing each other. Burns v. Burns, 518 So.2d 1205 (Miss. 1988); Trigg v. Trigg, 498 So.2d 334 (Miss. 1986). Small comfort is the majority's attempt to assure us that this Mississippi judicially-created equal property right can only be asserted in a divorce proceeding. That is what the present majority of this Court says. Yet, it will take but a slight turn of the screw to expand the assertion of this property right in a will contest or distribution of a deceased spouse's estate, or a suit to partite. Spouses can be ill-treated by testamentary devise and other manner as well. Mississippi Code Annotated §§ 93-3-1; -3; -5; and -7 put husband and wife on an equal footing with the right of each to own property separate and apart from the other. Whatever may be the law in the community property states, the remaining states have a different history on property rights. All of a sudden we switch, and become that to which no one is accustomed and with no compass.
This Court has no constitutional authority to create a property right where none was intended by the parties. Indeed, the Legislature may lack this authority as well, Art. 4, § 94, but the Legislature is not trying to mess with individual ownership. At the very least, any such vast and far-reaching change in the right to own property should be addressed first in that forum, not here.
The majority might very well consider that in creating a "joint marital property ownership," *917 it is likely to harm a wife. There is absolutely nothing in our lump sum alimony concept which requires a court to look to the source of ownership by the husband in determining what the wife should receive. Rather, the court looks to what the wife needs and what the husband has the ability to pay, whether he accumulated it on his own or got it from Aunt Nellie. Presiding Justice Prather in Ferguson sets out proper factors in making adequate provisions for the wife, but the majority here is using the wrong tool.
When a marriage of many years is terminated by divorce, society has a claim to see that a divorced woman does not have to go on welfare at her husband's death if he has property and assets on his own. A divorced woman likewise has a lawful claim against him and his property for what the termination of the marriage is doing to her, and it goes beyond some right to periodic alimony which would terminate at his death or her remarriage. All this can be obtained via lump sum alimony to be fixed in an equitable amount.
The award of lump sum alimony can also drastically affect the amount of periodic alimony the wife should receive and, rather than a lump sum alimony award being made after a determination of periodic alimony, it should be the other way around.
I failed to recognize in Draper v. Draper, 627 So.2d 302 (Miss. 1993), as the nose of the camel in the Arab's tent, so well illustrated by today's majority. I should have been skeptical of this Court's assertion of power. I would overrule Draper insofar as it exceeds the parameter of Jones v. Jones, which should represent the outer limit of our expansion of this nettlesome question, rather than the beginning of a new and wider vista.[1]
Insofar as a retirement pension is concerned, if the facts of the case justify it, and if permitted under the pension plan, the wife should enjoy the same rights in it at his death as she would have as his surviving widow. Under present (and without Draper) equitable powers such a decree could be fashioned by the chancellor. Moreover, again if the facts warrant it, the widow by court decree could receive during her divorced husband's lifetime a portion of his retirement pension payable to her via lump sum award, and not as periodic alimony. There are many factors in making an award, depending upon the kind of property and assets owned by the husband, and the income tax burden must be considered as well, but all this can be done under Jones, and without disturbing the right of any citizen, including a husband or wife, to own property in his or own individual names.
While I accord the majority the best of motives, it is a fact of life that good intentions do not insulate you from the consequences of bad judgment.
The right to own property cannot be better stated than 16A C.J.S. Constitutional Law § 506:
The right of private property is a fundamental, sacred, natural, inherent, and inalienable right, the protection of which is one of the most important purposes of government. It is a common-law right, which existed before the adoption of the federal and state constitutions, and is not now dependent on them for its existence. Property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law, i.e., rules or understandings that secure benefits and that support claims of entitlement to those benefits. However, to insure their continuance, property interests are guaranteed by the federal and by the various state constitutions.
The constitutional provisions for the protection of property should be liberally construed in favor of the right of property. Protection of the right to property is not dependent on the value or amount of property held. The right may not be submitted to vote, and depends on the outcome of no election. The right to enjoy property without unlawful deprivation is a personal right, regardless of the property in question.
I respectfully dissent.
DAN M. LEE, P.J., and McRAE, J., join this opinion in part.
*918 DAN M. LEE, Presiding Justice, dissenting:
Because a far-reaching decision broadly redefining the rights in property of the citizens of this State should be implemented by our Legislature, I cannot concur with the majority's suggestion that all assets acquired during a marriage are jointly accumulated, therefore, subject to equitable division. Accordingly, I respectfully dissent.
We should be mindful to confine the effects of our decisions to the litigants before the Court. One need look no further than the judicial opinions submitted in the case sub judice to discern the providence of that statement. At last count, four (4) separate judicial opinions were submitted in this case, embodying the beliefs and convictions of each individual author concerning a public policy matter of constitutional proportions. Each opinion goes beyond the facts of the case sub judice, recommending different methods of distributing property owned by spouses, incident to all divorces, not just the divorce of Bitsy and Mike. But, only the case of Bitsy and Mike is before the Court. For that reason, I would leave to the Legislature, the body elected by the citizens of this State to make laws, the decision to declare a law which would drastically change the rights in property of our populace and engender vast repercussions. By that method, all can be assured that such a change legislatively reflects the will of the citizens who are affected.
Although I do not share Chief Justice Hawkins' sentiments with reference to Ferguson v. Ferguson, 639 So.2d 921, I concur with the remainder of his opinion. Chief Justice Hawkins keenly recognizes and illuminates the inherent problems of creating new property rights for a spouse while concomitantly diminishing existing property rights in the other spouse, based on, ipso facto, the existence of the marital relationship.
Perhaps most important, as demonstrated by the Chief Justice's opinion, there is no need to supplement the means by which provision is made for spouses upon divorce. The chancery courts presently possess appropriate judicial devices with which to make adequate provision for both spouses incident to a divorce.
I also join Justice McRae's dissenting opinion. The ramifications of application of the majority's suggestion, of a presumption that all property owned by either spouse is marital property and not just part of their separate estates, is well-reasoned by Justice McRae. The old adage echoed by him, "if it ain't broke, don't fix it," possesses immeasurable wisdom. Accordingly, I respectfully dissent.
McRAE, J., joins this dissent.
McRAE, Justice, dissenting:
I disagree with this Court's decision to judicially legislate the issue of marital property distribution. Furthermore, I am disturbed that we have ushered in the doctrine of equitable distribution without any thought as to what assets of the parties might be subject to division by the court. The definition of "marital property" embraced by the majority is too all-encompassing and fails to consider the nature of the assets to be distributed. Moreover, I disagree with the award of fifty percent of James Hemsley's military and civil service retirement pension to his former wife. Accordingly, I dissent.
As the old saying goes, "if it ain't broke, don't fix it." Our system of lump-sum and periodic alimony has served fairly well to apportion the assets of divorcing couples. Why make such a drastic change?
The majority defines marital property as "any and all property acquired or accumulated during the course of the marriage." It espouses the presumption that all such property is subject to equitable distribution unless there is proof that the asset in question is attributable to one spouse's "separate estate prior to the marriage." By making so broad a sweep, the majority deems all property acquired during the marriage, even by specific gift or devise, to be marital property, regardless of title or proof that it was intended to be passed only to the named spouse. Apparently only that property acquired prior to the marriage might be deemed to belong to a separate estate, but only if there is some *919 proof that it was, indeed, acquired prior to the marriage.
The majority further finds that for purposes of divorce, there is a presumption that both partners have made an equal contribution, economic and domestic, to the marriage. In other words, regardless of what the evidence might show, the chancellor is to assume that there has been a fifty-fifty contribution to the assets of the marriage. Despite this apparently irrebuttable presumption, the chancellor is then directed to follow the guidelines set forth in Ferguson v. Ferguson, 631 So.2d 921 (Miss. 1994) when determining how any marital property should be divided. However, in Ferguson, the first factor to consider when dividing marital property is the existence of a "substantial contribution to the accumulation of the property." At 928 (emphasis added). To determine whether a party has made a "substantial contribution" to the accumulation of assets, the chancellor is directed to consider evidence of:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishments bearing on the earning power of the spouse accumulating the assets.
Id. Ferguson's detailed examination of whether a "substantial contribution" has been made appears superfluous, if not completely contrary to the presumption of equal contribution the majority today announces.
Ferguson further recognizes that only a spouse who has made a material contribution to the marital assets may claim equitable interest therein. Id. at 935. Moreover, only when a contribution is proven by a party does the chancellor have authority to divide the assets accumulated during the marriage. Id. Thus the "definition" of marital assets posited by the majority contradicts the scheme for property division set forth in Ferguson. Moreover, by establishing a presumption of fifty-fifty contribution, it would appear to overrule those cases where equitable distribution was based upon a showing of material or substantial contribution. See e.g., Jones v. Jones, 532 So.2d 574, 580 (Miss. 1988); Reeves v. Reeves, 410 So.2d 1300 (Miss. 1982); Clark v. Clark, 293 So.2d 447 (Miss. 1974).
The majority's attempt to define marital property fails also because it focuses on the facts pertinent to the marriage. To the contrary, any attempt to define what is marital property and what is not, or what assets may be subject to distribution, must focus instead on the attributes of the subject assets. That is, it must take into account factors such as the nature of the property; when, how and by whom it was acquired; and the existence of any contracts or other agreements governing its ownership or disposition.
The ramifications of the majority's approach of distributing "all property" without regard to the character of the assets at issue are far reaching. Should one spouse be entitled to a share of the other's family property in contravention of the express wishes of the donor or testator? Under today's opinion, property a father gives exclusively to his married child, but for the use of both, may now be subject to division. However, merely because the property passes to one spouse during marriage, the other spouse is not "equitably entitled" to a share of it. How might one party substantiate the fact that a recently acquired asset, a parcel of land, for example, was purchased with funds belonging to her prior to marriage? This is particularly problematic when the parties have been married for many years and sends a message to newly-married couples to document thoroughly the expenditure or disposition of any pre-marital assets. Might an asset change in character from separate to marital property? How is the court to identify and value these assets? If one spouse owned an interest in an oil or gas well prior to the marriage, under the proposed definition of marital asset, she alone would be entitled to that interest, but the royalties paid after marriage could be subject to division. Similarly, if one spouse acquired a stock portfolio prior to marriage, are dividends, *920 stock-splits and the appreciation of value from the date of the marriage subject to distribution as marital property? On the other side of the coin, how does indebtedness figure in to the definition of marital asset? Should it also be divided equally between the parties?
Statutes in other jurisdictions define marital property, often beginning with the presumption that all property acquired during the marriage is marital property. However, even in community property states, statutes expressly set forth exceptions to that presumption, based on the character of the assets at issue. On the most basic level, property acquired "by gift, devise or descent" is not subject to division. Ariz. Rev. Stat. Ann. § 25-211 (1973). Our neighboring state of Arkansas legislatively sets forth seven exceptions, mirroring those adopted by a number of other jurisdictions. Ark. Code Ann. § 9-12-315 (amended 1993) provides as follows:
(b) For the purposes of this section, "marital property" means all property acquired by either spouse subsequent to the marriage except:
(1) Property acquired prior to marriage, or by gift, bequest, devise, or descent;
(2) Property acquired in exchange for property acquired by gift, bequest, devise or descent;
(3) Property acquired by a spouse after a decree of divorce from bed and board;
(4) Property excluded by valid agreement of the parties;
(5) The increase in value of property acquired prior to marriage or by gift, bequest, devise or descent;
(6) Benefits received or to be received from a workers' compensation claim, personal injury claim, or social security claim when those benefits are for any degree of permanent disability or future medical expenses; and
(7) Income from property owned prior to the marriage, or from property acquired by gift, bequest, devise, or descent, or in exchange therefor.
See also e.g., Colo. Rev. Stat. Ann. § 14-10-113 (1993); Del. Code Ann. 13 § 1513 (1993); S.H.A. 750 ILSC 5/503 (1993) (formerly Ill. Rev. Stat. ch. 40, para. 503); Ky. Rev. Stat. Ann. § 403.190 (1986); Md. Code Ann., Family Law § 8-201 (1984); Me. Rev. Stat. Ann. tit. 19, § 722-A (1979); Mo. Rev. Stat. § 452.330 (1988); Wis. Stat. Ann. § 767.255 (1986). In other jurisdictions, statutes distinguish between marital property and nonmarital or separate property. Statutory definitions of separate or nonmarital property encompass many of the exceptions to the presumption of marital property enumerated in other states. See e.g., Fla. Stat. Ann. § 61.075 (amended 1991) (distinguishes marital and nonmarital liabilities as well); Minn. Stat. § 518.54 (amended 1993); N.C. Gen. Stat. § 50-20 (amended 1987); N.M. Stat. Ann. § 40-3-8 (1978) (distinguishes separate, community and quasi-community assets as well as liabilities); N.Y.Dom.Rel.Law § 236 (1986); Ohio Rev. Code Ann. § 3105.17.1 (Supp. 1993); Tenn. Code Ann. § 36-4-121 (1991); Va. Code Ann. § 20-107.3 (1990) (by far, the most detailed provisions set out by any state legislature); W. Va. Code § 48-2-1 (1992). It further has been held that in defining and distributing marital assets, the couple's "net assets" should be considered; that is, "the indebtedness owed against such asset should ordinarily be deducted from its fair market value." LaRue v. LaRue, 172 W. Va. 158, 304 S.E.2d 312, 320 (1983).
The definitions of marital (and nonmarital) property adopted by the legislatures in other jurisdictions recognize the realities of modern marriage. Increasingly, each party comes to the marriage with separate assets. A growing number of couples marry later in life, often after a previous marriage. More often than not, both spouses work. Any definition of marital assets must take these factors into consideration.
I further disagree with the majority's finding that Elizabeth Hemsley is entitled to a fifty percent share of her former husband's military and civil service retirement benefits. As we said recently in Flowers v. Flowers, 624 So.2d 992 (Miss. 1993), "a spouse has no vested interest in his/her spouse's military retirement pension." Id. at 995. Other recent decisions of this Court have recognized that Mississippi is not a community property state and likewise held that one spouse has *921 no vested right in the other's pension plan. Davis v. Davis, 626 So.2d 111 (Miss. 1993); Armstrong v. Armstrong, 618 So.2d 1278, 1282 (Miss. 1993); Southern v. Glenn, 568 So.2d 281 (Miss. 1990). In the past, we have recognized that pension plan assets are but a part of the stream of income a chancellor may consider when determining alimony and child support as well as modifications thereto. Brown v. Brown, 574 So.2d 688, 691 (Miss. 1990); Bowe v. Bowe, 557 So.2d 793, 795 (Miss. 1990). Today's opinion, however, sidesteps the issue and fails to characterize the pension plan as personal property, marital property or part of the stream of income. It fails also to take into consideration the tax consequences of dividing the plan assets and how the burden of any tax liability should be shared. See Draper v. Draper, 627 So.2d 302, 307-308 (Miss. 1993) (McRae, J., dissenting). It should also be noted that the legislature has exempted from seizure under execution or attachment those payments from pension or retirement plans necessary to support a debtor and any dependents. Miss. Code Ann. § 85-3-1 (1991). Assets that the legislature has seen fit to protect from creditors this Court now finds subject to division between divorcing spouses.
Finally, I disagree with affirming the chancellor's award of one-half attorney fees to Elizabeth Hemsley. As the majority points out, she admitted that she could pay her attorney fees from the $9,100.00 balance remaining from her share of the proceeds from the sale of the marital dwelling. While the award of attorney fees is within the discretion of the chancellor, it has been held that "if a wife is financially able to pay her attorney, she is not entitled to an attorney fee award." Cheatham v. Cheatham, 537 So.2d 435, 440 (Miss. 1988), quoting Carpenter v. Carpenter, 519 So.2d 891, 895 (Miss. 1988).
The majority now leaves the public, bench and bar in a quandary over the definition of marital property and matters governing its disposition upon divorce. Perhaps these matters should be left to the legislature. However, if we are to take the burden upon ourselves, we should look to other jurisdictions for insight, and to the fullest extent possible, consider the ramifications of the decisions we make.
Finally, although I do not share Chief Justice Hawkins' acceptance of the factors enumerated by the majority in Ferguson v. Ferguson, 639 So.2d 921 (Miss. 1994), I concur with the remainder of his insightful dissent.
Accordingly, I respectfully dissent from the majority opinion.
DAN M. LEE, P.J., joins this opinion.
NOTES
[1] While Draper, in making a fair and adequate provision for the wife, fosters judicial economy and efficiency, that is not decisive. The same argument can be made for lynching.