IRVING, P.J.,
for the Court:
¶ 1. On January 20, 2011, the Jackson County Chancery Court granted James R. Mauldin Jr. (Jim) and Donna Mauldin a divorce on the ground of irreconcilable differences. The chancery court also divided the marital estate. Feeling aggrieved, Jim appeals and asserts that the chancery court erred in its classification and valuation of marital assets and in its award of alimony and attorney’s fees to Donna.
¶ 2. Based on the facts of this case, we find that the chancery court did not err in its classification of the couple’s marital assets or in awarding alimony to Donna. However, the chancery court’s valuation of the marital assets assigned to Jim should have accounted for the outstanding debts on the property. Therefore, we affirm the chancery court’s judgment as modified.
FACTS
¶ 3. Jim and Donna were married on June 23, 1998, in Jackson County, Mississippi. Donna had two children from her previous marriage. She and Jim had no children together. The couple separated in June 2007. On February 12, 2009, the chancery court entered a temporary order prohibiting the “dissipation of any marital assets.” The order did not award temporary support to either party.
¶4. Donna owned her home prior to marrying Jim. She had paid off the mortgage on the home with her late husband’s death benefits. After Donna married Jim, her home became the marital residence. *178 When Donna married Jim, she was approximately $80,000 in debt.[1]
¶ 5. Jim and Donna refinanced the marital home in 1999, and Jim’s name was added to the mortgage. They used the refinancing proceeds to pay Donna’s outstanding debts. The couple agreed to sell the home prior to their separation in 2007; however, the home did not sell until after the couple had separated. Donna and Jim made a profit of $34,012 from the sale of the house and agreed to split the proceeds as follows: Jim received $4,500, and Donna retained $29,512 — $20,000 of which she deposited into her daughter’s guardianship account[2] to assist with college expenses.
¶ 6. During the marriage, Jim worked for Northrup Grumman (Northrup) and British Petroleum (BP). He maintained a retirement account with Northrup with a balance of $33,172, which he later transferred into his BP retirement account. At the time of trial, Jim’s BP retirement account balance was $48,048.27. Throughout the marriage, Donna worked part time as a substitute teacher, a teacher’s aide, and a records clerk. She maintains a retirement account with the Public Employees Retirement System (PERS) valued at $4,352. Donna currently works as an office manager for CableOne.
¶7. At trial, Jim testified that he felt that the marriage was over two years prior to the separation. However, he stayed with Donna because of his connection to her children. Jim stated that when he left Donna, he took a 1998 Dodge truck and a 2002 Alumacraft boat. Jim sold the truck for $7,000 and allegedly used $5,000 of the proceeds to pay off a lien on the truck. He used the remaining funds as a down payment on his new truck. Jim also sold the boat for $8,500, which he used to pay off the lien on the boat. Jim purchased a new home, a new motorcycle, and the new truck mentioned above after his separation from Donna. He financed these purchases by withdrawing/borrowing money from his retirement account. He withdrew $18,178.08 in August 2008 and also borrowed $20,895 against the account. Jim withdrew an additional $8,000 from his retirement account in the summer of 2009.
¶8. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 9. Domestic-relations matters are reviewed under the substantial-evidence/manifest-error standard. Wheat v. Wheat, 37 So.3d 632, 636 (¶ 11) (Miss.2010). Thus, a chancery court’s findings will not be disturbed on appeal unless the findings are manifestly wrong, clearly erroneous, or the court applied an erroneous legal standard. Id.

1. Classification and Valuation of Assets

¶ 10. Jim contends that the chancery court erred in its classification and valuation of the couple’s marital and separate assets. Specifically, Jim argues that the court erroneously classified his motorcycle, his new truck, and the increase in his retirement account as marital property. Additionally, Jim alleges that the chancery court incorrectly valued his new truck and the boat and truck that he sold after his separation from Donna.

*179
a. Classification of Assets

¶ 11. Marital property includes “any and all property acquired or accumulated during the marriage.” Id. at 637 (¶ 14) (quoting Hemsley v. Hemsley, 639 So.2d 909, 915 (Miss.1994)). “Generally, ... the marriage runs from the date of marriage until the [date of the] final judgment of divorce.” Id. at (¶ 15). However, the entry of a temporary-support order or a separate-maintenance order may serve as a line of demarcation to signal the end of the accumulation of marital property. Id.
¶ 12. Jim asserts that the accumulation of marital assets ended with the entry of the 2009 temporary order prohibiting the dissipation of marital assets. Donna contends that because the order did not provide for temporary support, the accumulation of marital assets continued until the date of divorce.
¶ 13. Although the divorce decree did not specifically state the date that the marriage ended for purposes of classifying marital and separate property, it is clear that the chancery court used the date of divorce rather than the date of the temporary order. As previously stated, absent the entry of a separate-maintenance or temporary-support order, marital property continues to accumulate until the date of divorce. Although the chancery court entered a temporary order in this case, the order did not provide for temporary support. Therefore, Jim and Donna’s marital assets continued to accumulate until the date of their divorce. Accordingly, even though Jim purchased his motorcycle and his truck after his separation from Donna, the chancery court properly classified these assets as marital property. Additionally, the increase in Jim’s retirement account since his separation from Donna is marital property because the increase occurred during the marriage. This issue is without merit.

b. Valuation of Assets

¶ 14. Jim also argues that the chancery court incorrectly valued the assets assigned to him during the distribution of the marital estate. He contends that the chancery court should have conducted its own investigation into the value of the assets and accounted for the debts on the assets. This Court, however, has recognized the principle that “findings on valuation do not require expert testimony and may be accomplished by adopting the values cited in the parties’ [Uniform Chancery Court Rule] 8.05 financial disclosures, in the testimony, or in other evidence.” Jenkins v. Jenkins, 67 So.3d 5, 13 (¶ 19) (Miss.Ct.App.2011) (citations omitted).
¶ 15. Here, the chancery court adopted the values that Jim and Donna had assigned to their assets in their Rule 8.05 financial statements. As such, we find that the chancery court did not err in considering the value of the couple’s marital property as listed on their Rule 8.05 financial statements without conducting an independent investigation. However, the court should have accounted for the indebtedness on the property, as listed in Jim’s Rule 8.05 statement and his Hemsley statement, in its valuation of the marital assets assigned to Jim. We find that the court should have credited Jim with only the equity in these assets.
¶ 16. In its order, the chancery court valued the Mauldins’ entire marital estate at $241,101.88. After factoring in the couple’s debt, excluding the indebtedness on the assets that were awarded to Jim, the chancery court determined the value of the estate to be $214,803.86. The chancery court stated that the marital estate and indebtedness should be divided equally between Jim and Donna. The chancery court then determined that Jim’s net share *180 of the marital estate was $141,850.21 and Donna’s net share was $72,953.65.
¶ 17. Included in the award to Jim were his 2007 F-150 Ford truck, valued at $18,800 with an indebtedness of $15,500; his Harley Davidson motorcycle valued at $14,600; his 2000 Keystone Trailer, valued at $3,800 with an indebtedness of $2,500; a 2002 Alumacraft boat and motor, valued at $8,500 with an indebtedness of $8,500; a 1998 Dodge truck, valued at $7,000 with an indebtedness of $5,000; and a 1998 Chevrolet Tahoe, valued at $5,900 with an indebtedness of $3,865.
¶ 18. Jim’s and Donna’s Hemsley statements agree as to the values and indebtedness of the 2007 Ford F-150, the 2004 Harley Davidson motorcycle, and the 2000 Keystone travel trailer. Also, Donna’s Hemsley statement and Jim’s Rule 8.05 statement agree as to the value and indebtedness of the 1998 Chevy Tahoe. Donna’s Hemsley statement lists a 2002 Alumacraft boat and motor valued at $8,500 and a 1998 Dodge truck valued at $7,000, with no indebtedness on either asset. While Jim did not list either the boat or the Dodge truck on his Rule 8.05 statement or his Hemsley statement, he did not substantially disagree with the value placed on either asset by Donna. However, he testified that there was an indebtedness on the boat and that he sold it for the amount of the indebtedness. He also testified that he had borrowed $5,000 and given the truck as collateral, that there was a balance owed of approximately $4,200, that he sold the truck for $7,000, and that he paid off the balance owed on it, with the remaining amount being used as a down payment on another vehicle that he did not describe. Further, Jim testified that he purchased the motorcycle with proceeds from a loan that he took out against his 401K. His Hemsley statement shows a value of $14,600 for the motorcycle, with a $13,000 lien against it. However, his Rule 8.05 statement shows no indebtedness on the motorcycle, indicating that it was paid in full from the 401K loan.
¶ 19. After subtracting the outstanding liens on the assets assigned to Jim to reflect their value in accordance with the parties’ Rule 8.05 and Hemsley statements, Jim’s gross share of the marital estate equals $108,334.21, while Donna’s gross share remains $86,102.66.

2. Alimony

¶ 20. As we have found error in the chancery court’s valuation of some of the marital assets subject to distribution, it is necessary to also adjust the chancery court’s alimony award to Donna. After the adjustment, the difference between Jim and Donna’s shares of the marital estate is $22,231.55.
¶ 21. The decision of whether to award alimony and the amount of the award are matters left to the chancery court’s discretion. Vaughn v. Vaughn, 798 So.2d 431, 436 (¶ 20) (Miss.2001). Thus, “[a]n alimony award will not be disturbed on appeal absent a finding of manifest error or abuse of discretion.” Sheffield v. Sheffield, 55 So.3d 1142, 1145 (¶ 19) (Miss.Ct.App.2011) (citing Voda v. Voda, 731 So.2d 1152, 1154 (¶ 7) (Miss.1999)). Alimony should only be considered when “an equitable division of marital property leaves a deficit for one party.” Rogillio v. Rogillio, 57 So.3d 1246, 1248 (¶ 8) (Miss.2011) (quoting Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994)). Lump-sum alimony is specifically used to adjust the financial inequities remaining after property division. Id. at 1250 (¶ 12). Here, after adjusting the value of the assets assigned to Jim to reflect their outstanding debts, Donna is left with a deficit of $22,231.55.
*181 ¶ 22. Before it awarded lump-sum alimony, the chancery court examined the factors promulgated by the Mississippi Supreme Court in Cheatham v. Cheatham, 537 So.2d 435, 438 (Miss.1988). The factors include: (1) substantial contribution to the accumulation of the payor’s assets by quitting work to become a homemaker or assisting in business; (2) the length of the marriage; (3) whether the recipient spouse has separate income or the separate estate is meager by comparison to the payor’s separate estate; and (4) whether the recipient spouse would lack financial security without the lump-sum award. Id.
¶ 23. The chancery court noted that, although Donna had worked several part-time jobs, she had acted as a homemaker for most of her nine-year marriage to Jim.[3] The court also noted Donna’s testimony that Jim never expressed a desire for her to work outside the home and the fact that Donna quit her job to become a stay-at-home mom. The court found that even though Donna now has a separate income, it is much less than Jim’s income. We agree with the chancery court that Donna would lack financial security without a lump-sum-alimony award. The court noted that a significant portion of Donna’s current income is used to cover her daily living expenses. Furthermore, the court acknowledged Donna’s heart condition, her reliance on medication, and her lack of medical insurance. Based on these findings, we cannot say that the chancery court erred in awarding lump-sum alimony to Donna.
¶ 24. As noted, the court stated that the assets and debts of the marital estate should be divided equally between the parties. Therefore, we see no need to remand this case to the chancery court for further proceedings. After making the adjustments in the value of the marital assets assigned to Jim, the corrected amount of Donna’s lump-sum alimony comes to $22,231.55, rather than the $70,000 awarded to her by the chancery court.

3. Attorney’s Fees

¶ 25. Jim also argues that the chancery court erred in awarding attorney’s fees to Donna. However, Jim is mistaken in this regard, as the chancery court did not award attorney’s fees to either party. Consequently, this issue is without merit.
¶ 26. THE JUDGMENT OF THE JACKSON COUNTY CHANCERY COURT IS AFFIRMED AS MODIFIED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. GRIFFIS, P.J., BARNES AND FAIR, JJ., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., NOT PARTICIPATING.

. This debt consisted of a $60,000 home-equity line of credit and $20,000 in credit-card debt.

. Guardianship accounts were established for Donna’s children after the death of their father.

. Although the chancery court referred to the parties' nine-year marriage, the record reflects that the parties were married for almost twelve and one-half years before they were divorced.