FAIR, J.,
for the Court:
¶ 1. The motion for rehearing is granted. The original opinion is withdrawn and this opinion substituted.
¶ 2. In this appeal from a judgment of divorce, Matthew Burnham argues that the chancery court ordered him to pay too much child support and that its division of the marital, property was inequitable. We find that substantial evidence supports the chancellor’s finding that Matthew could earn, and had earned, more than he claimed to be making, and that the property division, though' unequal, was within the chancellor’s discretion because it was calculated to eliminate the need for alimony. We affirm the judgment.
STANDARD OF REVIEW
¶ 3. Matthew contends that the judgment should be subject to a “heightened” standard of review because the chancellor largely adopted the proposed findings of fact and conclusions of law submitted by Dana. We do not agree; in Bluewater Logistics, LLC v. Williford, 55 So.3d 148, 155-157 (¶¶ 24-33) (Miss.2011), the Mississippi Supreme Court unambiguously held that the “heightened scrutiny” standard sometimes articulated in the past was illusory and that there is, in practice, no special standard of review for cases where the chancellor adopts the proposed findings of fact offered by one of the parties. Last year, the supreme court unanimously reaffirmed Bluewater, holding: “[T]his Court recently rejected the argument that factual findings should be reviewed under any sort of ‘heightened scrutiny,’ even if they are adopted verbatim from a party’s proposed findings of fact.” Miss. Comm’n on Envtl. Quality v. Bell Utils. of Miss., LLC, 135 So.3d 868, 877 n. 9 (Miss.2014).
¶ 4. “When [an appellate court] reviews a chancellor’s, decision in a .case involving divorce and all related issues, our scope of review is limited by the substantial evidence/manifest error rule.” Yelverton v. Yelverton, 961 So.2d 19, 24 (¶ 6) (Miss.2007). Therefore, this Court will not disturb the chancellor’s findings “unless the chancellor was manifestly wrong, clearly erroneous or a clearly erroneous *388 standard was applied.” Id. (citation omitted).
DISCUSSION
¶ 5. Matthew and Dana were married in 1999. The marriage produced two daughters, born in 2006 and 2008. At the time of the separation, Dana was a stay-at-home mom, while Matthew was a biology instructor at Jones County Junior College and a part-time farmer. Ultimately, the parties agreed to an irreconcilable differences divorce with- Dana having custody of the children. The issues of child support, property -division, and alimony were submitted to the court and form the basis of Matthew’s appeal.
1. Child Support
 ¶ 6. Matthew was ordered to pay $600 per month in support of his two children. On appeal, he argues that the chancellor erred by not following the child-support guidelines, which for two children specify 20% of the obligor parent’s adjusted gross income. See Miss.Code Ann. § 43-19-101 (Supp.2014). According to Matthew, the number the chancellor should have arrived at had he followed the guidelines is $523.61 per. month.
¶ 7. Matthew’s Rule 8.05[1] statement gave his monthly gross income as $4,189.58 “based on one check from 2012.” But his 2011 W~2 from JCJC indicated gross monthly income of approximately $4,548, and the 2010 figure is even higher. If the chancellor had applied the guidelines to the $4,548 number and accepted Matthew’s adjustments, he would have arrived at approximately $600 per month, which is what was ordered. Matthew also makes some dubious adjustments to his income, such as $667 per month for “mandatory insurance,” but Dana has not cross-appealed asking for an increase in support,
¶ 8. Furthermore, Matthew’s argument is premised around his claim that his income was — and only could be — the salary he was paid by Jones County Junior . College. But the chancellor was quite clear that, even though he apparently accepted Matthew’s claim of a gross monthly income from the college of $4,190, as well as Matthew’s various downward adjustments, additional income was imputed because Matthew had the ability to earn more.
. ¶ 9. ■ The record supports this overwhelmingly. Matthew had a Ph.D. and his job at the junior college required him to work, by his own admission, only six hours a day for nine months out of the year. According to his prior W-2s, Matthew had previously been earning up to ten thousand dollars a year more from the teaching position, and it is unclear why he earned less at the time of the divorce. Matthew also previously had a‘ side business trading in cattle, and though he claimed it' did not make money, the chancellor found that Matthew had hot been 'forthcoming about his finances. Matthew was also awarded marital assets, including real property, intended to be used to generate additional income.
¶ 10. All of these facts support the chancellor’s conclusion that Matthew could earn more money than he claimed to be making at the time of trial. The chancellor may impute additional income to an obligor parent who has voluntarily chosen to make less than he has the capacity to earn. Selman v. Selman, 722 So.2d 547, 555 (¶ 36) (Miss.1998).
¶ 11. The amount of income the chancellor would have to 'impute to Matthew was quite small and is readily determinable — about $380 per'month, or rough *389 ly $4,560 per year, if we accept that the chancellor employed the guidelines, as he said he did. Furthermore, the chancellor’s failure to explicitly state how much income he imputed to-Matthew is not ..reversible error. Clark v. Clark, 754 So.2d 450 (Miss.1999), is directly on point. There, the chancellor imputed an unspecified amount of income to the father and awarded $600 per month in support for three children. The supreme court held:
[W]hen a chancellor chooses not to follow the guidelines, this Court has enforced the statutory requirement that the chancellor make an on-the-record determination that the guidelines do not apply. In this case, Richard reported a gross income of $80,500 in 1996 and was ordered to pay a total of $600 per month in child support. Even if Richard’s reported gross income were not adjusted for taxes, etc., as provided for in the statute, the $600 award would exceed the statutory guidelines. That is, -the amount awarded- was approximately 23.61% of the gross income reported in Richard’s 1996 tax return.
However, “this Court is charged with reviewing the entire record.” Anderson v. Anderson, 692 So.2d 65, 71 (Miss.1997). The chancellor found, based on expert testimony, and Richard’s own testimony, that Richard was hiding assets and income, in order to avoid financial responsibility to his children and his wife of 33 years. In fact, based solely on the testimony regarding the payment of Richard’s employees, it was evident that Richard made more than he said he did (or he could not have paid his workers). Thus, applying the statutory guidelines to Richard’s reported income would not be accurate, in this case.
Furthermore, a deeper study of the record indicates that the chancellor was not intentionally deviating from the statutory guidelines. Rather, the chancellor was attempting to follow the statutory schedule for child support payments.
Moreover, the $600 monthly award would be correct, if Richard’s adjusted gross income were $32,727,27. The record supports such an award. s Also, at the motion for-rehearing, the chancellor offered to re-evaluate the figures, if Richard would, submit more complete financial data. Thus, any perceived inaccuracies in the calculation could have been corrected, if Richard had been more forthcoming about his actual income. For all these reasons, it appears that Richard’s argument on this point is without merit,
Id. at 459 (¶¶ 53-56) (internal citations omitted).
¶ 12. We affirm the chancellor’s award of child-support since the imputation of additional income is supported by the record.
2. Equitable Division
¶ 13. Matthew’s principal complaint is with the division of the marital property: he claims that it was unfair to award Dana most of the assets while saddling him with the marital debt. Not counting household goods, the couple’s marital assets had a total value of $521,130.48 accompanied by a total debt of $225,472.79.
¶ 14. Dana was awarded an automobile valued at $27,000, a Roth IRA in- her name valued at $1,226,87, and half of Matthew’s deferred compensation and state retirement accounts, - together valued at $53,911.47.
¶ 15. Matthew recéived half of his retirement and deferred compensation accounts, plus a Roth IRA in his name worth $730.67, two automobiles valued at $5,000 each, 9.62 acres of land valued at $10,000, *390 and a mobile home and accompanying land valued at $15,000.
¶ 16. The two largest assets were the marital residence, valued at $250,000, and approximately 51 acres of land which had been used in' Matthew’s farming operation, valued at $94,350. The chancellor ordered these two properties to be held until the youngest child reaches the age of majority, at which point they would be sold. Matthew would receive 75% of the value of the 51 acres and 25% of the value of the home, with Dana getting the rest. In the meantime, Dana would have possession of the home, Matthew the 51 acres, and Matthew would be responsible for the encumbrances, taxes, and insurance on both properties.
¶ 17. The debts were Matthew’s student loans,-at $8,479.95, the mortgage on the marital home, at $48,554.63, a home-equity line of credit secured by the house of approximately $100,000, and a $68,438.21 mortgage on the 51 acres.
¶ 18. To equitably divide property, the chancellor must: (1) classify the parties’ assets as marital or separate, (2) value those assets, and (3) equitably divide the marital assets. Hemsley v. Hemsley, 639 So.2d 909, 914 (Miss.1994). The value of the property and its status as marital or separate is not in dispute. In Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994), the Mississippi Supreme Court identified the factors that should be taken into consideration when determining the equitable division of marital property:
1.Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition-of the property;
b. Contribution to the stability and harmony of the marital -and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other' accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such. assets by agreement, decree or otherwise.
3. . The market value and the emotional value of the assets subject to distribution.
4. The value of assets- not ordinarily, absent equitable factors to-the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
¶ 19. The chancellor undertook a detailed analysis of these factors.- During the twelve-year marriage, Matthew had obtained his Ph.D., while Dana, though she held a bachelor’s degree, had stayed at *391 home since the children were born. Dana had moved with the family several times for Matthew’s educational and job opportunities. Matthew had-a much higher earning capacity than. Dana, who was making only eleven dollars per hour since she had rejoined the labor force.
¶ 20. As to dissipation, Matthew had liquidated much of the (marital) property that had been used in his cattle operation, contrary to a temporary order of the chancery court; and he had funded the cattle operation in part with money that was borrowed against the house. Matthew claimed to lose money in the side business, but he could not provide an adequate accounting despite his education and apparent sophistication. He had also used marital funds to pay down a student loan after the separation,' apparently because that debt was not dischargeable in bankruptcy. It was also noted that the house was located'next to Dana’s parents’ home, on land they had sold the Burnhams, and that Dana and the children desired to stay in the house, near their family. “It is preferable that the party who is awarded [custody of the children] should also be awarded use of the marital home.” Chamblee v. Chamblee, 637 So.2d 850, 863 (Miss.1994),
¶ 21. Perhaps the most important fact was that the chancellor had made the lopsided award with the intent of doing away with the need for alimony. “Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede.” Pierce v. Pierce, 132 So.3d 553, 564 (¶ 25) (Miss.2014) (quoting Ferguson, 639 So.2d at 929).
¶ 22. It has been said many times that “equitable distribution does not mean equal distribution.” Faerber v. Faerber, 150 So.3d 1000, 1005 (¶ 12) (Miss.Ct.App.2014). Given the chancellor’s thorough analysis of the Ferguson factors, supported as it is by record evidence, we can find no abuse of-discretion in t,he equitable, if unequal, award.
¶ 23. Finally, Matthew 'claims that he is simply unable to make the monthly payments on the' debts assigned to him. Again, he premises his- argument around the assumption that his income-earning capacity is equal to what he earns from the teaching position at Jones County Junior College.’ But as we explained in our analysis of the first issue",’the chancellor‘determined 'that Matthew was able to earn more, and that finding is supported by the record. We note that, prior to the divorce, the Burnhams were able to pay these debts, and others, while only Matthew worked. Moreover, his argument comparing his monthly salary to the monthly debt sérvice is specious; Matthew was awarded numerous saleable assets, and a significant part of the monthly cost he claims to be unable to pay is' attributable to the original, fifteen-year note on the marital home, which would be paid in full approximately five years' after the divorce judgment.
¶ 24. In conclusion, we find that Matthew has failed to show that the chancery court ahused its discretion in its.dnqsion of the marital property.
3. Supersedeas
¶ 25. Matthew filed an appeal bond to the Supreme Court of Mississippi with supersedeas. The chancery court, noting deficiencies in the supersedeas bond, entered a judgment discharging and dismissing the bond.
¶ 26. According to the Mississippi Rules of Appellate Procedure, “[t]he appellant shall be entitled to a stay of execution of a money judgment pending appeal if the appellant gives a supersedeas bond, payable *392 to the opposite party, with two or more sufficient resident sureties, or one or more guaranty or surety companies authorized to do business in this state,... ” M.R.A.P. 8(a).
¶ 27. The appeal bond filed by Matthew contained only his signature and one other for the guarantee. In City of Belzoni v. Johnson, the supreme court held that “[t]he City cannot be considered a surety within this. Court’s interpretation of the rules governing, supersedeas bonds, because the City was already principally liable for a portion of the judgment.” City of Belzoni v. Johnson, 121 So.3d 216, 221 (¶ 12); (Miss.2013). We apply the same rule here.) Matthew .is already primarily responsible for the monetary judgment, so he cannot serve as a surety for the appeal bond. The chancery clerk lacked authority to accept the bond because the bond was invalid. The chancery court, did not err in discharging and dismissing the su-persedeas bond.
¶ 28. THE JUDGMENT OF THE COVINGTON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. JAMES, J.,'CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN ' OPINION, JOINED IN PART BY IRVING, P.J. CARLTON, J., NOT PARTICIPATING.

. UCCR 8.05.