# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01134-COA

**RALPH MARTIN BILLINGSLEY**                                          **APPELLANT**

**v.**

**AMY DIANE BILLINGSLEY**                                              **APPELLEE**

DATE OF JUDGMENT:            03/13/2015
TRIAL JUDGE:                 HON. KENNETH M. BURNS
COURT FROM WHICH APPEALED:   LOWNDES COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      CARRIE A. JOURDAN
ATTORNEY FOR APPELLEE:       MARK G. WILLIAMSON
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:     DIVORCE GRANTED ON GROUNDS OF
                             ADULTERY IN FAVOR OF APPELLANT
DISPOSITION:                 AFFIRMED IN PART, REVERSED IN PART
                             AND REMANDED – 05/09/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**IRVING, P.J., FOR THE COURT:**

¶1.    Ralph Billingsley appeals the judgment of the Lowndes County Chancery Court dissolving the marriage between him and Amy Billingsley.   He alleges that the chancery court committed numerous errors in the classification and division of the marital estate as well as in matters involving the payment of expenses for the parties' minor children and the establishment of the visitation schedule.

¶2.    Finding error, we reverse in part, affirm in part, and remand for further proceedings.

## FACTS

¶3.    The parties were married on August 18, 1995, and separated on January 12, 2013; two

children were born to the marriage. At the time of trial, Amy was forty-nine years old, and Ralph was sixty years old. Ralph was the primary breadwinner for the family. He had been a corporate executive, and at the time of trial was serving as county administrator for Lowndes County, Mississippi. Amy was a part-time massage therapist and a part-time adjunct faculty member at the Mississippi University for Women (MUW). Amy earned approximately $30,000 per year, and Ralph earned approximately $132,000 per year. In 1995, when the parties married, Amy was working full-time at Sanderson Plumbing Products (Sanderson) as an inside salesperson, and Ralph was also working there as a financial officer. Amy continued to work at Sanderson for one more year after the parties married, leaving in 1996, after having worked there for eight years. She took a job and a pay cut as a research analyst at MUW. During the marriage, Amy performed many household chores and provided for the children while at times working in a part-time capacity. Ralph remained in his same position at Sanderson Plumbing Products during the duration of the marriage.

¶4. In September 2012, Amy told Ralph that she had been involved in an extramarital affair. The couple did not separate until approximately January 12, 2013. Amy initially filed a complaint for divorce against Ralph on September 13, 2013, alleging grounds of habitual cruel and inhuman treatment and habitual drunkenness, or, in the alternative, irreconcilable differences. As part of her complaint, Amy requested that the chancellor grant her temporary relief, which the chancellor granted on February 27, 2014. Ralph answered the complaint, and, on September 4, 2014, filed a counter-complaint for divorce, alleging adultery,

desertion, and habitual cruel and inhuman treatment, or, in the alternative, irreconcilable differences.

¶5.     The trial was conducted on December 8-9, 2014.  The court rendered its opinion on March 13, 2015, granting Ralph a divorce on the grounds of adultery, while denying Amy's petition for divorce.  Per the parties' agreement, they were given joint legal custody of the children, and Amy was given physical custody, with visitation to Ralph.  The rest of the judgment primarily addressed the division of the Billingsleys' property.[1]  Ralph then filed a motion with the court to reconsider and to clarify its decision with regard to the distribution of assets and certain provisions of visitation.  The court denied Ralph's motion, leading to this appeal.

¶6.     Additional facts, as necessary, will be related during our discussion of the issues.

## DISCUSSION

¶7.     "[W]e will not disturb a chancellor's findings when supported by substantial evidence unless the chancellor's judgment was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Carambat v. Carambat*, 72 So. 3d 505, 510-11 (¶24) (Miss. 2011).  "But when reviewing a chancellor's interpretation and application of the law, our standard of review is de novo." *Bond v. Bond*, 69 So. 3d 771, 772 (¶3) (Miss. Ct. App. 2011).  "To equitably divide property, the chancellor must: (1) classify the parties' assets as

---

[1] The chancellor calculated Ralph's separate property as follows: the Billingsley Farm, LLC, valued at $520,000, plus the separate portion of the Cadence Bank IRA of $251,593.04, for a total of $771,593.04.

3

marital or separate, (2) value those assets, and (3) equitably divide the marital assets."
*Randolph v. Randolph*, 199 So. 3d 1282, 1285 (¶11) (Miss. Ct. App. 2016) (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss.1994)).

### I.  Ferguson *Factors*

¶8.  Ralph argues that the chancellor misapplied several of the *Ferguson*[2] factors and incorrectly designated the amount of weight given to each factor, resulting in a disproportionate distribution of the marital estate.  His main argument focuses on the fact that Amy had an extramarital affair; therefore, he concludes that the total distribution should not have been in her favor.  In response, Amy asserts that the chancellor used his discretion in dividing the couple's assets, and his decisions were supported by substantial evidence and therefore proper.  She also notes that any errors made on the part of the chancellor were not material and do not require reversal, as they had no bearing on the outcome of the case.

¶9.  Although Amy admitted to adultery, and the chancellor granted a divorce to Ralph on that ground, her misconduct was only one of several factors to be analyzed under *Ferguson* to determine the appropriate distribution of the marital assets.  Ralph's assertion that Amy's adulterous misconduct should have predominated over all other factors is incorrect as this Court has previously stated that "chancellors should not view equitable distribution as a means to punish the offending spouse for marital misconduct.  Rather, marital misconduct

---

[2] In *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), the Mississippi Supreme Court created an eight-factor test to be used by chancellors when dividing property in divorce actions.

is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." *Bond*, 69 So. 3d at 773 (¶6). Amy's misconduct is one of many factors the chancellor used to determine the correct distribution of assets and, based on the chancellor's order, it appears that he did not take Amy's misconduct lightly, as he noted: "Mrs. Billingsley's infidelity caused the total collapse of the marriage." Accordingly, the chancellor gave appropriate consideration to Amy's adultery in ordering equitable distribution of the marital property.

¶10.    With respect to the division of marital property, the Mississippi Supreme Court in *Ferguson* provided a nonexclusive list of factors for our chancery courts to consider in determining the proper division of the marital estate:

1.    Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

   a.    Direct or indirect economic contribution to the acquisition of the property;

   b.    Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

   c.    Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2.    The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise[;]

3.    The market value and the emotional value of the assets subject to

5

distribution[;]

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928. "In reviewing a chancellor's findings, we do not conduct a *Ferguson* analysis anew. Rather, we examine the chancellor's judgment and the record to ensure the chancellor applied the correct legal standard and did not commit an abuse of discretion." *Bond*, 69 So. 3d at 773 (¶5). With respect to the chancellor's decisions, Ralph submits that the chancellor misapplied the specific factors listed below. We limit our discussion to only those factors Ralph alleges were misapplied. As a result of the misapplication, according to Ralph, the chancellor awarded Amy significantly more assets than she should have received. After reviewing the chancellor's opinion, we find that there was substantial evidence to support his findings; therefore, the chancellor did not abuse his discretion in conducting his *Ferguson* analysis, as discussed below.

 1. *Substantial contribution to the accumulation of the property*

6

¶11.    Ralph argues that his overall contributions should have been given greater weight, especially in light of Amy's admitted adultery.  He acknowledges that "marital partners can be equal contributors whether or not they both are at work in the marketplace." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994).  However, he notes that although Amy was the primary caregiver for the children, she was not the sole caregiver, as he was involved in the children's daily lives as well.  The court stated that "the contributions and efforts of Mr. and Mrs. Billingsley, whether economic, domestic or otherwise are of equal value."   Ralph disagrees, as he asserts that he provided much more economically to the marriage and was also involved domestically; therefore, this factor should have weighed heavily in his favor.

¶12.    Amy reiterates the court's assertion that she provided the primary care for the children, tended to most of the domestic matters, and that for divorce purposes, her and Ralph's contributions and efforts, whether economic, domestic, or otherwise, are of equal value.  In line with the chancellor's order, she argues that her contributions domestically and economically were viewed equally to Ralph's and the court did not abuse its discretion in finding that they contributed equally to the marriage.  *See Hemsley*, 639 So. 2d at 915.

B.       *Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties, and duration of the marriage*

¶13.    Ralph asserts that the chancellor did not place enough weight on Amy's extramarital affair when dividing the marital property.  Although he admits that he understands that the

7

chancellor simply cannot punish Amy for causing the breakup of the marriage, he submits that she should not be rewarded at his expense.

¶14. Amy responds that she and Ralph were married for eighteen years, and during that time she was the primary caregiver to their children. One year after the parties married, Amy quit her job of eight years with Sanderson, taking a job and a pay cut as a research analyst at MUW. After their son was born in 1998, Ralph and Amy decided that Amy would no longer work and would stay at home. Amy was a stay-at-home mother for the next three years. After their daughter was born, Amy returned to work only on a part-time basis and continued taking care of their children. Amy worked part-time at Baptist Hospital in Columbus for the next five years. As the children were getting older and were involved in more activities, Amy needed more flexibility with her work schedule, so Ralph and she decided that she needed to take a part-time job as a massage therapist with a local spa. Amy has been working part-time at the spa since 2008. She argues that despite her infidelity, she was vital to the stability of the home environment throughout the marriage.

¶15. It appears from the chancellor's opinion that he weighed this factor in favor of Ralph because he stated that Amy's infidelity caused a "total collapse of [the] marriage."

> *C.* *Contribution to the education, training, or other accomplishment bearing on the earning power of the spouse accumulating the assets*

¶16. Ralph states that he was forty-one years old and had worked at Sanderson for over nineteen years when he and Amy married. He had earned an accounting degree and his CPA

8

license, and he was vice president of finance and chief financial officer at Sanderson prior to his marriage to Amy. He notes that he never received any additional degrees, certifications, or promotions after his marriage to Amy. The chancery court stated: "It does not appear to the [c]ourt that Mrs. Billingsley contributed to Mr. Billingsley's education, training, or accomplishments." He argues that Amy did not contribute to any of his education, training, or accomplishments, but he contributed extensively to her education, training, and accomplishments. Amy worked as a part-time professor at MUW as a result of the master's degree she obtained while married to Ralph. She also worked as a massage therapist as a result of the massage-therapist training and certification that she received while married to him. Thus, Ralph asserts that the chancellor should have weighed this factor more in his favor.

¶17. Amy responds that she quit her job of eight years at Sanderson to further Ralph's career. She argues that after Ralph went to work for Lowndes County, as the county administrator, and she began working part-time and was the primary caregiver to the children, Ralph was able to accept a position on the Board of Community Counseling for which he received $10,800 a year.

¶18. Despite Ralph's arguments to the contrary, the court stated that "during the last [eighteen] years, Mr. Billingsley was able to make some of his accomplishments because of Mrs. Billingsley's care of the home and children." Essentially, since much of Amy's time was spent at home with the children, the court found that this aided Ralph's accomplishments

9

as he could spend more time away from home working. We find no error with the court's reasoning and decision with respect to this factor.

> 2. *The degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise*

¶19. Ralph states that in November 2012, Amy withdrew $5,000 from their home-equity line of credit account. He alleges that this took place before the couple separated. He argues that if this had not been withdrawn from the account, it would have been a joint asset and would have been divided evenly. However, since Amy put the funds in her personal checking account, she was allowed to keep the entire balance. He contends that the court rewarded Amy and punished him by not addressing this joint asset. He requests that Amy be required to pay him $2,500.

¶20. Although Amy admits to withdrawing the money, she argues that there is no evidence in the record that she used the $5,000 for anything other than ordinary and reasonable living expenses. She asserts that since the use of the asset was for ordinary and reasonable living expenses during the separation, it was not dissipation. *See Stribling v. Stribling*, 906 So. 2d 863, 872 (¶39) (Miss. Ct. App. 2005) (no dissipation where disabled husband cashed $26,000 certificate of deposit but used funds for living expenses while divorce was pending). The chancery court stated that the parties "did not agree to any property distributions," but did not make a specific finding as to whether the withdrawal of the $5,000 constituted dissipation. However, apparently Amy's testimony persuaded the court that no dissipation occurred

10

because the court did not credit Ralph's portion of the marital estate with one-half of the amount withdrawn by Amy. Based on Amy's testimony, we cannot say that the court erred in not treating the withdrawal as dissipation of the marital estate.

   3. *The needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity*

¶21. As to the next disputed factor, the seventh factor in the *Ferguson* analysis, the court ruled that Ralph has a significantly greater earning capacity than Amy. Ralph concedes that that is a correct statement, but only over the next four years. He argues that he has four years left until he reaches Social Security retirement age whereas Amy has sixteen years left until she reaches Social Security retirement age. Ralph asserts that their age difference, combined with Amy's two undergraduate degrees, her master's degree, and her massage-therapy certification, gives her a significantly greater earning capacity going forward than he has. In addition, he notes that his earning-capacity advantage over the next four years is diminished by child support, the children's insurance, Amy's COBRA insurance, and debt service on additional debt. He submits that this factor should have weighed more in his favor, particularly with regard to the division of his retirement accounts.

¶22. Amy argues that Ralph makes $132,000 a year and will continue to make that amount or more for quite some time. He has considerable separate/nonmarital property, including income-producing land. She argues that she only makes $30,000 per year and that for the past fourteen years, the only jobs that she has had are part-time jobs. She asserts that working part-time was a mutual decision by Ralph and herself so she could devote her time primarily

11

to raising their children. She states that she has no separate/nonmarital property. One spouse may be awarded a greater share of marital assets based on need, even though both spouses contributed equally to asset accumulation. "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006) (quoting *Ferguson*, 639 So. 2d at 929 (Miss. 1994)). Although the chancellor stated that Ralph has substantially greater earning power than Amy, he also noted that she is underemployed and, with her education, "regardless of the distribution made by this [c]ourt, Mrs. Billingsley will have to seek more gainful employment." We find no error with the chancellor's decision in this regard.

## II.     Cadence IRA Calculation

¶23.    Ralph argues that the chancellor incorrectly calculated the marital portion of the IRA. Amy responds that she understands Ralph's argument to be about the date of the valuation—identical to the PERS argument below. However, in his reply brief, Ralph asserts that he does not make an argument regarding the demarcation date with respect to this issue, but rather takes issue with a miscalculation on the part of the chancellor. The chancellor determined that Ralph's separate contribution to the Cadence IRA was $124,582.01 and that $247,216 was contributed to the Cadence IRA during the course of the marriage and that, at the time of the divorce, the value of the IRA was $751,024. The chancellor determined that Ralph's separate contribution constituted 33.5 percent of the total contributions to the IRA

and designated that percentage as the nonmarital portion of the IRA. This calculation resulted in Ralph receiving $251,593.04 as his nonmarital portion of the IRA plus a marital portion of $249,715.50. We find that the chancellor erred because (1) the figure used by the chancellor for the marital contributions was incorrect; (2) the formula used to calculate Ralph's separate portion of the IRA failed to account for the continuing appreciation of Ralph's separate contribution; and (3) the calculation treated the appreciation of the marital portion of the IRA as if the total marital contributions had been made as of the date of the marriage, despite the fact that those contributions were made over a twelve-year period. Therefore, we reverse and remand this issue to the chancery court for a corrected calculation of Ralph's separate portion of the IRA.

¶24. The record reflects that, during the trial, Ralph submitted a spreadsheet that showed the amount of the appreciation on his separate contribution through December 31, 2012, the demarcation date that Ralph urged the chancellor to use in computing the marital portion of the IRA. As of that date, the marital contributions and the appreciation on the contributions totaled $247,216. As stated, the chancellor added Ralph's separate contribution of $124,582.01 to the $247,216 figure and divided the amount of Ralph's separate contribution by the sum of those two figures to arrive at the percentage of Ralph's contribution. The chancellor then multiplied that percentage times the total value of the IRA as of the date of the trial, rejecting the demarcation date urged by Ralph.

¶25. Ralph then filed a motion for reconsideration in which he accepted the demarcation

date used by the chancellor —December 5, 2014—and extended his computation through that date. His spreadsheet then showed the total marital contributions plus appreciation to be $293.645.78, and his separate contribution plus appreciation to be $457,378.22. The chancellor denied Ralph's motion without explanation or a discussion of Ralph's added computations to comply with the demarcation date used by the chancellor. We find that the chancellor erred in doing so.

¶26. Our law is clear that the chancery court is required to determine the separate estate of each party, as well as the marital estate. Each party is entitled to that party's separate estate plus the appreciation associated with the investment of items in the separate estate, provided neither party has actively contributed to the appreciation during the course of the marriage. *Wheat v. Wheat*, 37 So. 3d 632, 638 (¶20) (Miss. 2010). Therefore, we reverse and remand this issue to the chancery court with directions that it recompute the nonmarital portion of the Cadence IRA. On remand, the chancellor is not bound by Ralph's calculations if the court finds a mathematical error in the calculations, but the court must credit Ralph, as a part of his nonmarital portion of the IRA, all of the appreciation on his separate contribution of $124,582.01 through December 5, 2014. To do so, the chancellor must segregate the appreciation consistent with the appreciation shown on the investment statements that were introduced during trial. In this regard, we note that Amy did not object to any of Ralph's calculations as being inconsistent with the investment statements.

*III.     Citizens and Renasant Accounts*[3]

¶27.    With respect to the Renasant Bank account, Ralph argues that during the marriage, he used this account as his personal checking account, so it should have been classified as his separate/nonmarital property.  However, the court classified this asset as marital and divided it.  Amy argues that there was no error with the court's disposition of that account.  On the financial statements of the parties, Amy does not list the Renasant account as an asset at all; conversely, Ralph lists the account as his separate personal account, and his name is the only name on the account.  Although the chancery court incorrectly referred to the account as a joint account, we cannot find error with the court treating it as marital property and dividing it between the parties as a marital asset because Ralph's testimony that he used it as his personal account throughout the course of the marriage does not necessarily make it his separate property.  He did not testify that the money that was deposited into the account came from his separate estate.

¶28.    The chancellor determined that the parties would retain their personal checking accounts.  Ralph argues that the court incorrectly listed the Citizens account as his separate account and awarded the full amount to him.  He asserts that the Citizens account was actually a joint account and its $100 balance should have been divided between him and Amy.   Amy responds that giving Ralph the $100 instead of dividing it between them is

---

[3] The record contains numerous references to different "checking accounts"; however, it is not clear in all instances which account is being addressed.

immaterial and would not have changed anything. She alleges that in Ralph's Uniform Chancery Court Rule 8.05 financial statement, he listed the Citizens checking account in his name only and never testified differently. We find no error with the court's decision in this regard.

*IV.    Wells Fargo IRA*

¶29.    Ralph argues that the chancellor erred in classifying the Wells Fargo IRA as a marital asset. He alleges that the contributions to this IRA were made prior to the marriage and that no contributions were made during the marriage. Since this was separate property, he argues it should not have been listed as a marital asset subject to division and distribution.

¶30.    Amy responds that, although the court listed the Wells Fargo IRA as a marital asset, the court awarded Ralph the entire amount; therefore, listing it under Ralph's separate/nonmarital property would have increased the value of his separate/nonmarital property the exact same amount and, therefore, the error is of no consequence.

¶31.    Amy's analysis is incorrect. Ralph testified on direct and cross-examination that the IRA was his separate property. He also testified that he owned it before their marriage and had not contributed to it during the marriage. His assertions were not disputed at trial, nor were they disputed in Amy's appeals brief. In his order, the chancellor identified the IRA as "Ralph's Wells Fargo IRA" but treated it as a marital asset and allocated the entire balance to Ralph. However, since the court erred in classifying the IRA as a marital asset instead of part of Ralph's separate estate, that error affected the amount of the marital estate to be

16

divided between the parties. Although the amount of the misclassified IRA—$12,890—is fairly small in comparison to the overall amount of the marital estate—$798,421—as determined by the chancellor, we find that this error requires that the case be reversed and remanded.

V. *Valuation Date: PERS and Old West Point Road Property*

¶32. Ralph argues that the chancellor erred on the valuation date for the PERS account and for the Old West Point Road property. He asserts that the court should have used the date of the separation as the date to determine the value of these marital assets, since Amy made no contribution to the marriage after the separation date. The court selected the trial date of December 8, 2014, as the point of demarcation for purposes of evaluating the marital estate. Amy argues that this was totally within the chancellor's discretion. We agree. "The law in Mississippi is that the date on which assets cease to be marital and become separate assets[,] what we refer to . . . as the point of demarcation[,] can be either the date of separation (at the earliest) or the date of divorce (at the latest)." *Randolph*, 199 So. 3d at 1285 (¶9) (internal quotations omitted). "Ultimately, however, the chancellor has the discretion to draw the line of demarcation." *Id*. We find that the chancellor did not abuse his discretion. This issue is therefore without merit.

VI. *Additional Financial Awards*

A. *Health Insurance*

¶33. Ralph argues that since Amy is receiving rather substantial child support and has the

17

ability to earn a considerable income, she should be required to pay one-half of the medical and dental insurance premiums for the minor children. Amy asserts that although Ralph argues about the children's insurance award, he agreed to continue to pay for and provide the children's insurance. Even in the absence of Ralph's agreement to pay these amounts, we find no error in the court's ordering Ralph to be responsible for these expenses. This issue is without merit.

### B. Life Insurance

¶34. Ralph requests that this Court clarify that the beneficiaries of the life insurance designated in the opinion and judgment of the chancery court include his son, Baxter, from a previous marriage. The chancellor's judgment only lists the couples' two children. Amy responds: "Ralph's son from another marriage is not an issue in this case." We agree. This issue is without merit.

### C. Tax Exemptions for the Minor Children

¶35. The chancellor ordered that Amy would be allowed to claim the youngest child on her tax return, and Ralph would be allowed to claim the oldest child. Ralph argues that based on the property distribution favoring Amy, she should not be again rewarded with a tax exemption. Ralph further argues that if the exemptions were going to be split between him and Amy, he should have been allowed to claim the youngest child. Ralph cites no authority for his position. Therefore, we see no need to address this issue any further. Suffice it to say we find no abuse of discretion on the part of the chancellor in this regard.

### D. Private-School Tuition/Meals

¶36. In its order, the court stated that because Amy was receiving rather substantial child support and had the ability to earn a considerable income, the parties should decide whether the children would attend private school in the future and who would be responsible for the private-school expenses after the close of the current school year. As to the then-current school year, which was the 2015/2016 school year, the court ordered that the parties split the school expenses equally between them. Ralph argues that the court should have ordered Amy to reimburse him for half of the school expenses for all years going forward. Since Ralph was not ordered by the court to pay any future school expenses for the children, we decline to address this issue.

### E. COBRA Insurance Coverage

¶37. Ralph argues that the court incorrectly awarded Amy coverage under COBRA for twelve months and ordered him to pay for it. He asserts that because he received more debt and less cash than Amy, he should not have had to pay the cost of her insurance coverage. He submits that this was an obvious error, and this Court should order Amy to reimburse him the amount of the COBRA coverage. We decline his request, as we find that the chancellor did not abuse his discretion in ordering payment of twelve months of insurance coverage for Amy. This issue without merit.

### VII. Visitation Schedule

¶38. The parties agreed on the custody of the children and the majority of the visitation.

They agreed that they would share legal custody and Amy would have physical custody. Based on the record, it appears that the parties were to present an agreed order to the court consisting of their visitation agreement. In his order, the chancellor stated, "the [c]ourt received excerpts from e-mails of counsel for the parties containing their understanding of the agreement between the parties. The [c]ourt has attempted to follow the details set out in the e-mail excerpts . . . ." However, Ralph argues that the chancellor erred in not awarding him visitation with the children on any Easter Sunday. In addition, he argues that the weekly visitation schedule was not what they agreed to.

¶39. Amy argues that it was in the chancellor's discretion to allocate visitation arrangements absent an agreement by the parties. "Visitation is a matter within the chancellor's sound discretion. The chancellor is charged with fashioning a visitation schedule that is in the best interests of the children, and the chancellor's visitation decision is afforded great deference by this Court." *Solangi v. Croney*, 118 So. 3d 173, 179 (¶25) (Miss. Ct. App. 2013). As evidenced by the statement in the chancellor's order, he attempted to provide a visitation schedule consistent with the information available to him. Moreover, if the visitation schedule set forth in the chancellor's order was not consistent with the parties' agreement, Ralph should have sought a modification on this issue in the chancery court. Having failed to do so, he cannot be heard to complain here. This issue is without merit.

VIII.    *11th Street North House*

¶40. At the time of trial, the 11th Street North property was valued at $200,000, with an

20

outstanding debt of $203,511. The Old West Point Road property was valued at $300,000, with a mortgage balance of $121,000. Ralph had purchased the 11th Street North property in 1984, eleven years prior to his marriage to Amy. When he and Amy married, they used the 11th Street North property as their marital domicile. The chancellor found both properties to be marital property and subtracted the negative equity of the 11th Street North property from the positive equity in the Old West Point Road property to arrive at $175,489 of total equity. He then gave each party half of that equity—$87,744.50 each.

¶41. Ralph argues that the chancellor did not give him credit for approximately $70,000 in equity which he had in the 11th Street North property at the time of his marriage to Amy. Ralph testified that in 1998, after being married to Amy for only three years, he and Amy had the 11th Street North property appraised and it was valued at $195,000, with an outstanding loan in the amount of $125,000. There is no evidence in the record, and no claim is made, that the property had appreciated in value by $70,000 during his first three years of marriage to Amy. However, in 1998, he and Amy took out a loan for $132,000, $125,00 of which they used to pay off the existing mortgage. According to Ralph, they got an additional $120,000 to make renovations to the master bedroom. In 2011, they took out a $150,000 home-equity loan against the 11th Street North property and used it as a down payment on the purchase of the Old West Point Road property.

¶42. At the time of trial, approximately three years after the purchase of the Old West Point Road property, the Old West Point Road property, as stated, was valued at $300,000, with

21

an outstanding mortgage of only $121,000. As we understand Ralph's contention, the $179,000 equity in the Old West Point Road property was the result of the $150,000 down payment made with the proceeds from the home-equity loan taken out against the 11th Street North property. The problem with the chancellor's distribution of the equity stemming from the two homes is that it did not account for Ralph's preexisting equity in the 11th Street North property. While the evidence does not prove that in 1995, the year of Ralph's marriage to Amy, the equity in the 11th Street North property was $70,000, it is reasonable to deduce that it did not appreciate that much in value in the first three years after the marriage. We are mindful that the 11th Street North property became marital property and that the chancellor did not err in classifying it as such. However, the chancellor's splitting the equity in the Old West Point Road property equally between Ralph and Amy fails to take into consideration that a good portion of that equity emanated from the equity that Ralph had in the 11th Street North property before it became marital property. Since we are already reversing this case for other reasons, we direct the chancery court to reconsider whether the equity in the marital homes should be divided equally between Ralph and Amy in light of Ralph's initial nonmarital investment in the 11th Street North property.

¶43. Finally, Ralph also alleges that he paid all of the expenses associated with the 11th Street North home, beginning in 2014 and continuing until the home was sold in 2015. He argues that since it was a joint asset for equity distribution, it should have also been a joint asset for all expenses. He asserts that since Amy was given fifty percent of the equity in the

22

homes, she should have had to pay fifty percent of the expenses he paid until the home was sold. Amy does not directly respond to Ralph's argument regarding the issue of expenses. Since we have already directed that the chancery court take a new look at the division of the equity in the homes, it may also look at this issue.

¶44. We affirm the chancellor's judgment in all aspects except as to the computation of Ralph's nonmarital portion of the Cadence IRA, the classification of the Wells Fargo IRA, and the division of the equity in the marital homes. While it would be a simple matter for this Court to do the recalculations, more than simple mathematics is involved. Had the court correctly classified and evaluated the marital estate, it may have awarded Amy a greater percentage of the marital estate to compensate for the reduction. As to these matters, we remand for further proceedings consistent with this opinion.

¶45. **THE JUDGMENT OF THE CHANCERY COURT OF LOWNDES COUNTY IS AFFIRMED IN PART, AND REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED THREE-FOURTHS TO THE APPELLANT AND ONE-FOURTH TO THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, GREENLEE AND WESTBROOKS, JJ., CONCUR. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. FAIR, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

23