# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01047-COA

SHANNON JANUARY CASE                                              APPELLANT

v.

DANIEL JUSTIN CASE                                                APPELLEE

DATE OF JUDGMENT:                07/31/2020
TRIAL JUDGE:                     HON. EDWARD E. PATTEN JR.
COURT FROM WHICH APPEALED:       ADAMS COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:         LISA JORDAN DALE
                                 EDWIN L. BEAN JR.
ATTORNEYS FOR APPELLEE:          DAVID M. SESSUMS
                                 CLIFFORD C. WHITNEY III
NATURE OF THE CASE:              CIVIL - CUSTODY
DISPOSITION:                     AFFIRMED IN PART; REVERSED AND
                                 RENDERED IN PART - 05/10/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., GREENLEE AND SMITH, JJ.

### GREENLEE, J., FOR THE COURT:

¶1.    Shannon Case appeals from the Adams County Chancery Court's judgment of divorce awarding her ex-husband, Daniel Case, sole legal and physical custody of their children B.C. and E.C.[1] She also takes issue with the court's failure to divide the marital estate equitably, award permanent alimony, and order adequate rehabilitative alimony. After review, we find that the chancellor's decisions on child custody and alimony were supported by substantial evidence and not an abuse of discretion. However, we also find that the chancellor made

---

[1] Initials are used to protect the identity of the minor children.

calculation errors in the equitable distribution of property. Accordingly, we affirm in part and reverse and render in part.

## FACTS AND PROCEDURAL HISTORY

¶2.     Daniel and Shannon were married on March 5, 2006. At the time, Daniel was self-employed, and Shannon worked as his secretary.  Two daughters were born of the marriage. B.C. was born in 2015, and E.C. was born in 2016.[2] Subsequently, Shannon became a stay-at-home mom. At the time of the hearings, Daniel invested in and marketed real estate as a business.

¶3.     The Cases separated in September 2018 after Daniel obtained an ex parte domestic abuse protection order against Shannon. Shannon filed a complaint for divorce, which was later dismissed after the parties reconciled. In January 2019, the parties separated again. Shannon filed for divorce on January 14, 2019, on the grounds of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Shortly after, Daniel filed his answer to the complaint for divorce.

¶4.     A temporary order was entered on February 5, 2019, for the parties to maintain joint custody of B.C. and E.C. In August 2019, Chancellors E. Vincent Davis and George M. Ward filed a joint order recusing themselves from the case and requested the Supreme Court to appoint a special chancellor for the case. Shortly thereafter, Shannon amended her complaint to allege that Daniel had committed adultery. The Supreme Court entered an order

---

[2] At the time of their marriage, Shannon had three children from previous relationships: Jake (ten years old), Will (five years old), and Abigail (two years old). In 2017, Abigail moved from the Case household to live with her biological father. In 2018, Shannon's son Will moved to live with his father as well.

appointing Chancellor Edward E. Patten Jr. as a special chancellor to preside over the case. In September 2019, Daniel filed an answer to the amended complaint and a counter-complaint alleging that Shannon had committed adultery and was addicted to drugs and alcohol. The matter was heard on January 29 through 31, 2020, and on July 13 and 14, 2020.

¶5.     According to Shannon, the parties' marriage began to disintegrate around late 2017. Daniel admitted that he had committed adultery while he was still married to Shannon. During her testimony, Shannon also admitted to engaging in extramarital affairs after she and Daniel separated but before their divorce was finalized. The chancellor heard evidence regarding the division of the marital estate, alimony, and child custody and support.

¶6.     After a full trial on the merits, the chancellor rendered his judgment, granting Shannon a divorce from Daniel on the ground of adultery. In his "Final Judgment of Divorce," entered on July 31, 2020, the chancellor addressed the parties' personal property, which amounted to $95,475, dividing that value by awarding each party approximately one-half, $47,736.

¶7.     The chancellor also addressed investments in real property. Daniel owned an interest in three primary entities: (1) Case Land Company LLC, (2) JAWS Investment LLC (JAWS), and (3) Delta Paradise LLC. At trial, the parties presented appraisals and expert testimony for the valuation of the marital assets. Shannon hired Elbert Bivins, CPA, and Daniel hired James Koerber, CPA. The chancellor set the date of valuation of the marital property as near the date of the parties' temporary order, February 5, 2019, adopting Koerber's date of valuation, January 31, 2019.

¶8.     The chancellor determined that all the parties' property was classified as marital

3

property and that the parties were entitled to a fifty-fifty equitable distribution of the marital assets. The chancellor then proceeded to divide the marital assets using *Ferguson*[3] for guidance.

¶9.     The chancellor found that Daniel owned a twenty-five percent interest in Delta Paradise. The chancellor determined that Daniel owned a one hundred percent interest in Case Land Company and in JAWS Investment. He further found that although Daniel's interest in Delta Paradise amounted to $295,000, after applying a twenty-percent control discount and a fifteen-percent marketability discount, Daniel's interest was valued at $200,621. Based on the testimony, the chancellor determined that Case Land Company had a negative value of $10,220. The chancellor also determined that the marital assets also consisted of the lake house (valued at $188,000), mobile home equity ($6,873), certificates of deposit ($58,222), life insurance cash value ($14,445), Sara Hill loan ($1,500), house equity ($203,711.80), and the balance remaining paid by Daniel into the court's registry for Shannon's expert witness fees and attorney's fees ($4,863.20). The value of the marital estate, therefore, was $668,016.05. However, the chancellor then adjusted that total after factoring in that the lien on the lake house exceeded its $188,000 value. This left the total value of assets being $480,016. The chancellor thus awarded each party $240,008. The chancellor ruled that Shannon should receive $203,711.80 in house equity and the remaining balance of $4,863.20 (of the $40,000 deposited) in the court's registry. Daniel was given sixty days to pay the remaining balance of $31,433 owed to Shannon.

---

[3] *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

¶10. After a valuation and division of the marital assets, the chancellor found that the *Armstrong*[4] factors did not warrant permanent periodic alimony. However, Daniel was ordered to pay Shannon $2,500 per month in rehabilitative alimony for four years. The chancellor then turned his attention to the remaining issues of child custody and support. Following an on-the-record *Albright*[5] analysis, the chancellor granted Daniel custody of B.C. and E.C. and visitation to Shannon.

¶11. On August 10, 2020, following the entry of the chancellor's final judgment, Shannon filed a motion to reconsider. Daniel filed a response in opposition on August 19, 2020. The chancellor entered an "Order Granting Motion for Reconsideration in Part and Denying Motion for Reconsideration in Part" on August 31, 2020. In this order, the chancellor amended the final judgment to reflect the value of JAWS Investment—$351,997—which he had inadvertently omitted in determining the total marital estate for equitable distribution. Due to the chancellor's amendment, the marital estate's value increased by $351,997, with each party being allocated an additional $175,998.50. The chancellor denied all the other relief Shannon sought. The chancellor ordered Daniel to pay Shannon in two payments of $87,999.25 on or before June 30, 2021, and $87,999.25 on or before December 31, 2021.

¶12. From that order, Shannon appeals. After review, we affirm in part and reverse and render in part.

### STANDARD OF REVIEW

---

[4] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

[5] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

¶13. "This [c]ourt has a limited standard of review in examining and considering the decisions of a chancellor." *Ravenstein v. Ravenstein*, 167 So. 3d 210, 215 (¶8) (Miss. 2014). If supported by substantial evidence, a chancellor's factual findings will not be disturbed unless "the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." *Varnell v. Rogers*, 198 So. 3d 1278, 1280 (¶7) (Miss. Ct. App. 2016). "On appeal [this] Court is required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong." *Newsom v. Newsom*, 557 So. 2d 511, 514 (Miss. 1990). As long as a chancellor's findings of fact are supported by substantial credible evidence, they will remain undisturbed on appeal. *Pevey v. Pevey*, 270 So. 3d 250, 257 (¶18) (Miss. Ct. App. 2018).

## DISCUSSION

### I. Whether the chancellor properly determined child custody.

¶14. Shannon claims the chancellor erred by granting custody of B.C. and E.C. to Daniel. She contends that the court's determination should be reversed because the chancellor erred in his analysis of the *Albright* factors.

¶15. It is well established that the child's best interest and welfare are the guideposts in child custody cases. *Albright*, 437 So. 2d at 1005 ("[T]he polestar consideration . . . is the best interest and welfare of the child."). To help ensure a proper custody determination, the supreme court in *Albright* enumerated the following factors for a court to consider: (1) the age, health, and sex of the child; (2) "the continuity of care prior to the separation"; (3) parenting skills of each parent; (4) "the willingness and capacity to provide primary child

6

care"; (5) "the employment of the parents and the responsibilities of that employment"; (6) the "physical and mental health and age of the parents"; (7) "emotional ties of the parent and the child"; (8) the moral fitness of each parent; (9) "the home, school, and community record of the child"; (10) the preference of the child; (11) the stability of the home environment; and (12) "other factors relevant to the parent-child relationship." *Id*.

¶16.    The *Albright* factors are intended to ensure that the chancellor follows a process that considers all facts relevant to the child's best interest." *Vassar v. Vassar*, 228 So. 3d 367, 375 (¶27) (Miss. Ct. App. 2017). An *Albright* analysis is not a "mathematical formula." *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶15) (Miss. 2001). Although "the *Albright* factors are important, . . . the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Hall v. Hall*, 134 So. 3d 822, 827 (¶19) (Miss. Ct. App. 2014). "The chancellor, by his presence in the courtroom, is best equipped to listen to witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses." *Mabus v. Mabus*, 890 So. 2d 806, 819 (¶56) (Miss. 2003) (citing *Rogers v. Morin*, 791 So. 2d 815, 826 (Miss. 2001)).

¶17.    Because Shannon contends that the chancellor did not correctly weigh the *Albright* factors, this Court reviews the chancellor's analysis to determine whether "the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." *Varnell*, 198 So. 3d at 1280 (¶7).

### 1.    Age, Health, and Sex of the Child

¶18.    Shannon asserts that the factor of age, health, and sex of the child "should swing

7

slightly in [her] favor based on the tender-years doctrine." She argues that the doctrine, though weakened, still gives a presumption that a mother "is generally better suited to raise two girls," especially when they are "at an age that a mother's influence is important." Shannon claims that this factor should have favored her because of the children's age and sex. However, it is well established that the tender-years doctrine is only a presumption and one of several factors to be considered. *Mercier v. Mercier*, 717 So. 2d 304, 307 (¶15) (Miss. 1998).

¶19.    At the time of trial, B.C. was four years old, and E.C. was three years old. The supreme court has ruled that "a child is no longer of tender years when that child can be equally cared for by persons other than the mother." *Id*. Here, the chancellor noted that "since February 5, 2019, the parties have had a true joint physical custody arrangement; two days with one parent, two days with the other parent during the week, and alternating Friday, Saturday and Sunday." He believed that either parent could care for B.C. and E.C.

¶20.    Regarding the children's health, the chancellor explained that although B.C. had some degree of Tourette Syndrome, neither parent identified a particular skill set to make one parent better suited in caring for her than the other parent. Additionally, E.C. was found to be in good health other than having recurring ear infections. The chancellor found this factor was neutral. The chancellor's finding is supported by substantial evidence.

### 2.    Continuity of Care Prior to Separation

¶21.    Shannon argues that the chancellor erred by finding that the continuity-of-care factor was neutral. In support of her argument, she asserts that she was the "day-to-day caregiver"

of the children prior to and throughout the separation.

¶22. "[T]he original articulation of the *Albright* factors directed the chancery court to consider the continuity of care prior to separation." *Edwards v. Edwards*, 189 So. 3d 1284, 1287 (¶11) (Miss. Ct. App. 2016). However, "the Supreme Court has since held that care after separation must be considered as well." *Id*.

¶23. Shannon asserts that she was the primary caregiver because she prepared special lunch boxes for the children, fed, bathed, and dressed them, purchased their clothes or picked out their clothes for purchase, and took them to their doctor and dental appointments. Daniel disputed Shannon's assertions and testified that Shannon utilized a nanny and housekeeper more than she represented to the court. Daniel admitted that he too relied on assistance from others when caring for the children.

¶24. The chancellor recognized that both parties cared for the children throughout the marriage and after the separation. A review of the record shows that substantial evidence supported the chancellor's finding that this factor was neutral.

### 3. Parenting Skills

¶25. Shannon argues that she has had more time to develop her parenting skills as a stay-at-home mom. She contends that the paternal grandparents are heavily involved in the day-to-day care of the children while they are with Daniel, and his parents' involvement should not be attributed as his parenting skills. Shannon claims that unlike Daniel, she handled all the parenting duties "without the daily assistance of any other person."

¶26. The chancellor acknowledged Shannon's claims that she provided the bulk of the

physical care, emotional support, discipline, and guidance prior to the temporary joint-physical-custody arrangement. However, the chancellor also noted that Daniel denied Shannon's claim, arguing that he handled just as much caregiving as Shannon did.

¶27. Shannon next takes issue with the fact that both girls were injured in a horse-riding incident, Daniel posted pictures of B.C. sleeping beside a loaded rifle, and Daniel operated heavy machinery with the girls while consuming alcohol. The chancellor made the following findings with respect to Shannon and Daniel's parenting skills:

> Exhibit 4, she says that he exercised poor parental judgment in allowing [B.C.] to sleep in the truck next to a loaded rifle and a visible beer can in a coffee holder. Daniel explains that the child was placed in the truck asleep. He took the picture, and she was immediately placed in the lap of another individual, and that they drove to another location while they were doing deer plots, that she was never unattended with the gun, and that it was not a lapse of judgment on his part. She says it's poor judgment to operate a tractor with B.C. while drinking a beer as set forth in Exhibit 4. Daniel didn't talk about that or rebut it. She says he did not take proper care of their safety while horseback riding resulting in minor injuries to both the girls. Exhibit 5 shows the horse prior to the fall and the text about the injury. Daniel says it was just an accident, neither of the girls were seriously injured, and that it was not an example of providing to provide [sic] for their safety.

While Shannon proceeded to accuse Daniel of exhibiting bad judgment, the chancellor revealed bad judgment on Shannon's part, stating:

> She believes the photos of the alcohol still and liquor bottles, some with alcohol, and some empt[y], are examples of bad judgment. He did not rebut that, but there's no evidence of a DUI. William did not corroborate her story about the lake house and him driving drunk. It's also of note that, if you're going to raise that, the Court's also going to mention the fact that Shannon was at a bar and leaves the bar with a man and gets in a pick up truck and has sex with him in downtown Natchez. So there's alcohol issues perhaps on both sides.

¶28. Shannon argued that she provided the children with a routine, a task she apparently

felt Daniel was unable to do because he was too orderly. In his opinion, the chancellor found that Daniel's "orderly" conduct was a positive, stating:

> She says that Daniel is obsessed with order and that this throws off his parenting ability of small children. Well, I think stability is one of the issues that children need in their house and being an orderly person certainly is not contrary to parenting and providing a stable environment. [B.C.] - - she said [B.C.] suffers more separation anxiety than [E.C.], and that she actively works to comfort the children. That's not so with Daniel. And there are witnesses that say that [B.C.] has more - - is very anxious, but that [the] separation anxiety is triggered when she's picked up by her mother and runs and tries to hide. She believes that [B.C.] is favored by Daniel and cites [B.C.] having a horse, as an example, and also new clothes as an example. Daniel didn't rebut that. Haley Tosspon tells us that Daniel caused disruption at the school by his excessive coming to have lunch with [B.C.]. She's observed [E.C.] crying and brought to school by her dad and always happy with her mama. She observed Daniel sending out-of-date antibiotic and expired yogurt. She observed Daniel send cold macaroni and cold mashed potatoes for lunch while commenting on the lunchboxes that Shannon sends. She observed Daniel interjecting himself at lunchtime during Shannon's days and said it was more of a show, and [E.C.] more of a behavioral problem and escalated in the last year. What's interesting about Ms. Tosspon's testimony is that she said the rule that Cathedral adopted was because of Daniel, and Kimberly Burkley, the assistant administrator and principal of the elementary, said that just wasn't so. It causes this Court to question what her motivations were in her testimony and how much weight should be given to her observations, especially when there are counter-observations, maybe not in the school setting, but in other setting showing a close relationship between the dad and his two daughters.

¶29. Finally, Shannon contends that the chancellor considered her relationship with her older children as a negative factor and attributed her older children's problems to her parenting skills. Shannon claims that any problems with her older children should equally be attributed to Daniel, as he had raised them for most of their lives. The chancellor stated:

> I'm going to repeat this again on another factor, but I do want to make sure that the record reflects that I considered this under parenting skills, and that is Shannon in caring for her other children, specifically William. He did not graduate from high school, that she allows him to stay in her home, and for

11

extended period, without being employed. He has not made any effort to get his GED and brings his girlfriend over and spends the night with her in Shannon's home against her objections; that her oldest son, Jake, says she is a horrible mother, and I'm not going to give a lot of weight to his testimony because he is intimately tied in with his stepfather, but all the same, you have a child that says and testifies in open court that he has a list in his pocket of all the reasons she's a horrible mother and that she was not invested and engaged in him as he grew up; and we have Abigail who, for whatever reason and whatever motivation left the family home. Shannon still has custody of that child; yet, the child does not live with her when Mr. Case has been removed from the situation. So those are all factors of other children under her care that should be noted.

¶30. Here, the chancellor's opinion reflects that he considered every incident and fact that Shannon mentioned and gave them the weight as he saw fit. Again, we give deference to the weight the chancellor assigned to each factor. *Sanders v. Sanders*, 281 So. 3d 1043, 1050 (¶23) (Miss. Ct. App. 2019). We find no manifest error with the chancellor's findings. We will not disturb his findings where sufficient evidence exists in support of those findings. *Hall*, 134 So. 3d at 825 (¶8).

### 4. Willingness and Capacity to Provide Primary Child Care

¶31. Shannon argues the chancellor erred by not finding that the factor of willingness and capacity to provide primary child care and employment responsibilities favored her because she had more time to spend with the children and did not work the same long hours as Daniel. According to Shannon, "a parent taking the day-to-day care of the children independently of the outside day-to-day help of other family members is a more stable consistent environment for the children."

¶32. Despite the chancellor's finding that both parents have adequate housing for the children, he found that Shannon's internal family dynamics made her family support group

"totally inadequate." Although Daniel worked long hours and ran multiple businesses, his schedule was flexible, and he had several family members willing to help him with childcare. Daniel's father testified that they would consider moving closer to Daniel so they could assist with the children, if necessary. Daniel's mother also helped with transportation to and from the girls' school and extra-curricular activities.

¶33. Shannon claims that Daniel's daily need for assistance is evidence of the impact Daniel's employment had on his capacity to provide primary care. The chancellor disagreed, finding Daniel's family support to be a positive element. Furthermore, in addressing the parties' employment responsibilities, the chancellor noted Shannon's desire to return to college, which would naturally result in her relinquishing her status as a stay-at-home mom to an extent.

¶34. This Court has held that "this factor [can] be applied in two ways: either to prefer a parent who draws an income over one who does not, or, more often, to prefer a parent who works less or not at all and can therefore spend more time with his children." *Owens v. Owens*, 950 So. 2d 202, 210 (¶26) (Miss. Ct. App. 2006). Although Shannon would have liked the chancellor to apply the latter, he was within his discretion to apply the former, which he did. The record supports the chancellor's findings as to this factor.

### 5. Employment of Each Parent and Employment Responsibilities

¶35. Shannon was unemployed, and Daniel was self-employed. Although Daniel worked, he arranged for childcare when needed and maintained that his schedule is flexible. We find no issue with the chancellor's analysis of this factor.

¶36. Finally, it is worth noting that Shannon takes issue with the fact that the chancellor rarely stated whether a factor favored her or Daniel. "The chancellor must address each factor that is relevant to the case, but [he] does not have to decide that each factor favors one parent or the other." *Sanders*, 281 So. 3d at 1050 (¶23) (citing *Harden v. Scarborough*, 240 So. 3d 1246, 1251 (¶11) (Miss. Ct. App. 2018)). "Nor does *Albright* require that 'custody must be awarded to the parent who "wins" the most factors.'" *Id*. Rather, "the chancellor is simply required to address and consider the relevant factors in determining what custody arrangement would be in the child's best interest." *Id*.

¶37. A review of the record shows that the chancellor properly considered all evidence and testimony before him. In his opinion, the chancellor addressed each factor and properly articulated his rationale for each. This analysis resulted in Daniel being awarded custody of B.C. and E.C. As to Shannon's argument that the chancellor erred in his *Albright* analysis, we give deference to the weight that the chancellor assigned to each *Albright* factor. This Court will not re-weigh the evidence. In considering the children's best interest and welfare, the record establishes that substantial credible evidence supported the chancellor's ruling. Therefore, this final contention is without merit.

### 6. The Physical and Mental Health and Age of the Parents

¶38. While the chancellor did not indicate whether the factor of physical and mental health and age of the parents favored either party, Shannon argues that this factor is neutral. Both parties are approximately forty years old and in good physical health. Shannon and Daniel have a history of depression and anxiety and take medication for these issues. Daniel also

14

manages hypertension and according to Shannon, suffers from mild Tourette Syndrome. Shannon presented no medical documentation to support her diagnoses.

¶39. Shannon claimed that Daniel abused alcohol. In support of her claim, Shannon cites to an incident at the lake house, Daniel's credit card statements that reflect alcohol purchases, and a still located on the property. Shannon now claims that the chancellor continued to mention her sexual encounter at a Natchez bar and implies that the chancellor was punishing her for her actions. On the contrary, after discussing Shannon's testimony regarding Daniel's alcohol use, the chancellor referenced the incident to call attention to Shannon's own alcohol use and subsequent actions.

¶40. Next, Shannon argued that Daniel had psychological problems. Specifically, Shannon testified that Daniel told her he heard voices on three separate occasions. The chancellor expressed his concern regarding the credibility of Shannon's accusation since she failed to mention the incident to her therapist, Dr. Patricia Brawley.

¶41. Daniel accused Shannon of having a drug problem. The court ordered Shannon to submit to drug testing, and she passed each test. The chancellor noted that there were no drug tests to support Daniel's contentions. We reiterate that the chancellor is "vested with the responsibility to hear the evidence, assess the credibility of the witnesses, and determine ultimately what weight and worth to afford any particular aspect of the proof." *Garner v. Garner*, 283 So. 3d 120, 140 (¶84) (Miss. 2019). For the above reason, we find substantial evidence supports the chancellor's findings of facts as to this factor.

### 7. Emotional Ties of the Parent and Child

15

¶42. Although the chancellor noted that B.C. would attempt to run and hide from Shannon, the chancellor found that the children were bonded emotionally to both parents. The chancellor found that the testimony was undisputed that both parents love their children. We find that chancellor did not err in his analysis here.

### 8. Moral Fitness

¶43. The chancellor did not give Shannon or Daniel the benefit of the moral-fitness factor. According to Shannon, the chancellor referenced her sexual activities in almost every factor but failed to apply the same "disdain" to Daniel's extramarital affairs, despite the fact that this was an adultery-grounded divorce.

¶44. Here, both parties engaged in extramarital affairs—Daniel before the separation, and Shannon after the separation. While Daniel first engaged in an extramarital affair, the chancellor noted that between January 2019 and June 2020, Shannon had sexual relations with five different men. Shannon explained that her medication caused the increase in her sexual encounters. The chancellor expressed his concern with Shannon's reasoning, noting that Shannon had not reported the medication's side effect to a medical professional. Regardless, "where both parties engage in extramarital affairs, neither should get the benefit of a finding of moral fitness." *Lawrence v. Lawrence*, 956 So. 2d 251, 260 (¶34) (Miss. Ct. App. 2006) (citing *Fulk v. Fulk*, 827 So. 2d 736, 740 (¶15) (Miss. Ct. App. 2002)). We find that the record supports the chancellor's finding.

### 9. Home, School, and Community Record

¶45. At the time of trial, B.C. was four years old and E.C. was three years old. Both

16

children attended Cathedral Elementary School.

¶46. The chancellor did not express if the factor of their home, school, and community record favored either parent. However, the chancellor acknowledged the observations of the girls' teacher, Hayley Tosspon. She testified that B.C. was shy, timid, quiet, reserved, and sad the previous year; while E.C. was outgoing and happy. Tosspon also discussed Daniel's involvement at the school. The chancellor addressed Tosspon's statement that a change in the school policy forbidding parents from walking down the hallway or coming into the classroom was based on Daniel's frequent visits to have lunch with B.C. The chancellor found the statement was inaccurate and noted that the girls' principal, Kimberly Burkley, contradicted Tosspon's testimony testifying that the school's policy change was not specifically enacted because of Daniel's actions.

¶47. It is the chancellor's role to weigh and assess the credibility of the witnesses and the weight of the evidence before it. *See Chamblee v. Chamblee*, 637 So. 2d 850, 859 (Miss. 1994) ("The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony."); *see also Rainey v. Rainey*, 205 So. 2d 514, 515 (Miss. 1967). We find that the chancellor's determination is supported by substantial credible evidence.

### 10. Children's Preference

¶48. The children, being four and three, are too young to assert a preference. There was no error in the chancellor's analysis of this factor. *See Roley v. Roley*, 329 So. 3d 473, 505 (¶101) (Miss. Ct. App. 2021).

### 11.    Stability of the Home Environment

¶49.    Shannon claims the chancellor erroneously considered the issues with her older children and her lack of extended family under the factor of stability of the home environment. Specifically, Shannon argues the chancellor overemphasized the extended family portion of his analysis.

¶50.    The chancellor did not specify whether Shannon or Daniel received the benefit of this factor. However, in analyzing this factor, the chancellor explained that the problems Shannon had with her older children and the lack of extended family were factors relating to the stability of the relationships around Shannon. The chancellor found that not only did Daniel have extended family, he had extended family willing to move if needed to assist with the children.

¶51.    Shannon argues that she provided the children with a routine, a trait she felt Daniel was unable to do because he was too orderly. While Shannon deemed Daniel's need for order as a negative, the chancellor felt that an "orderly person" contributed to a stable environment for the children. Further, the chancellor recognized that although both Shannon and Daniel provided testimony regarding their church attendance and participation, their pastor corroborated Daniel's church involvement more so than Shannon's. The chancellor's last observation under this factor expresses a concern that there were "a lot of things" that the chancellor did not know and that those unknown issues did not "reflect positively upon Shannon." The record contains substantial evidence to support the chancellor's findings.

### II.    Whether the chancellor erred in his application of the *Ferguson*

18

**factors.**

¶52. Shannon claims the chancellor erred in the distribution of the marital assets. Specifically, Shannon takes issue with the date of demarcation and miscalculation errors on the part of the chancellor. "Mississippi law requires equitable distribution of the marital estate during divorce proceedings." *Reynolds v. Reynolds*, 287 So. 3d 1019, 1023 (¶8) (Miss. Ct. App. 2019) (quoting *Griner v. Griner*, 235 So. 3d 177, 184 (¶9) (Miss. Ct. App. 2017)). "When the parties request that the chancellor resolve the issue of property division, the chancellor must do three things: (1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably." *Id*. (quoting *Burnham v. Burnham*, 185 So. 3d 358, 361 (¶12) (Miss. 2015). The chancellor must employ the factors set forth in *Ferguson*.

¶53. The *Ferguson* factors are the following:

(1) contribution to the accumulation of property;

(2) dissipation of assets;

(3) the market or emotional value of the assets subject to distribution;

(4) the value of assets not subject to distribution;

(5) the tax and economic consequences of the distribution;

(6) the extent to which property division may eliminate the need for alimony;

(7) the financial security needs of the parties; and

(8) any other factor that in equity should be considered.

*Ferguson*, 639 So. 2d at 928. "[E]quitable distribution of property does not necessarily mean

19

an equal division of property." *Reynolds*, 287 So. 3d at 1024 (¶9) (quoting *Carter v. Carter*, 98 So. 3d 1109, 1113 (¶11) (Miss. Ct. App. 2012)). Instead, "fairness is the prevailing guideline in marital division." *Id.* (quoting *Ferguson*, 639 So. 2d at 929). This Court, in reviewing a chancellor's judgment, only analyzes the chancellor's findings in applying the *Ferguson* factors; "we do not conduct the *Ferguson* analysis anew." *Id.* (quoting *Carter*, 98 So. 3d at 1112 (¶9)). We must allow the distribution to stand as long as the chancellor properly applies *Ferguson*. *Id.*

### A. Date of Demarcation for Property Valuation

¶54. Shannon argues that the chancellor abused his discretion by using a date (January 31, 2019) closest to the parties' temporary order (February 5, 2019) as the date of demarcation to value marital assets. According to Shannon, "the chancellor committed manifest error by determining the line of demarcation to be January 31, 2019 then choosing to selectively use the value of some assets nine to fifteen months after the line of demarcation" and the Koerber report. Shannon argues that the chancellor should have used a demarcation date of January 31, 2020, and Bivins' report because that date was closer to the values the chancellor used for some of the couple's assets. Based on Shannon's calculations, the entire marital estate would have been valued at $2,794,347 if applying Daniel's twenty-five percent ownership in Delta Paradise LLC or $3,134,357 if applying a thirty-three percent ownership as Shannon requested.

¶55. "The law in Mississippi is that the date on which assets cease to be marital and become separate assets, what we refer to as the point of demarcation, can be either the date

20

of separation (at the earliest) or the date of divorce (at the latest). Ultimately, however, the chancellor has the discretion to draw the line of demarcation." *Wilderman v. Wilderman*, 301 So. 3d 787, 794 (¶12) (Miss. Ct. App. 2020) (quoting *Billingsley v. Billingsley*, 240 So. 3d 422, 433 (¶32) (Miss. Ct. App. 2017)). The date the chancellor chose was the end of the month, five days before the date of the temporary order.[6] Here, the chancellor had full discretion to use either the January 31, 2019 date or the January 31, 2020 date as the date of demarcation. Finding no error in the chancellor's ruling, this issue is without merit.

### B.      Miscalculations

¶56.    The basis of Shannon's argument concerning the equitable distribution of property centers around mathematical miscalculations on the part of the chancellor.  Shannon argues that the chancellor made mathematical errors in assigning value to the parties' marital property. We agree that there were some errors in computation but do not find that they warrant reversal. As a result of the mathematical errors being factored into the equation of equitable distribution, Shannon did not receive the $34,874.50 to which she was entitled. The parties provided the chancellor with a list of marital property and values associated with each as supported by their individual experts. We will address the miscalculations and Shannon's arguments in turn.

### i.      Lake House

¶57.    Shannon argues that the chancellor should have determined that the value of the lake

---

[6] In assessing the interests of the parties in an ongoing business and in valuating those interests, making that determination at the end of the month nearest that date is generally appropriate.

house was $275,000, as represented in the former couple's financial documents submitted to the court.[7] A line of credit secures the lake house in the amount of $228,392, which was included in the JAWS Investments business valuation. According to Shannon, if the chancellor had accepted the $275,000 as the lake house value and subtracted the $228,392 balance owed on the line of credit, the lake house would then have a net equity of $45,608.

¶58.    Instead, the chancellor accepted Daniel's October 2019 lake house appraisal value of $188,000, as listed in his most recent financial statement. *See Marter v. Marter*, 95 So. 3d 733, 739 (¶20) (Miss. Ct. App. 2012) ("A chancery court's findings on valuation may be accomplished by adopting the values cited in the parties' [Uniform Chancery Court Rule] 8.05 financial disclosures, in the testimony, or in other evidence."). The chancellor zeroed out the value of the lake house when considering the $228,392 debt associated with the lake house. The chancellor did not err in ruling that the lake house had no equity and therefore no value for equitable distribution.

### ii.    F-150 Truck

¶59.    Shannon argues, and Daniel admits, that the $69,749 debt on a Ford F-150 truck was counted twice by the chancellor. The chancellor awarded each party their respective vehicles and ordered them to pay the debt associated with each. Shannon complied and paid the debt in full. However, the debt of Shannon's F-150 was also deducted from the value of Case Land Company. Therefore, the value of Case Land Company should be increased by $69,749. The chancellor assigned Case Land Company a negative $10,220 value, when the

---

[7] Daniel's financial statement was dated December 3, 2018; and Shannon's financial statement was dated January 24, 2019. *See* UCCR 8.05.

true value, with the addition of the $69,749, was actually $59,529. This value should be adjusted into the equitable distribution.

### iii. Marital Home

¶60. The chancellor used the sale of the marital home to determine its contribution to the equitable distribution. Shannon argues that the chancellor should have used the $1,000,000 home value found in her financial statement as it was the value nearest the line of demarcation and a more credible value than the $1,100,000 value listed in Daniel's financial statement. A line of credit secured the marital home in the amount of $375,159, which was included in the Case Land Company business valuation. According to Shannon, if the chancellor had accepted the $1,000,000 as the marital home value and subtracted the $375,159 balance owed on the line of credit, the marital home would then have a net equity of $624,841.

¶61. The chancellor was presented with all financial documents in determining the correct value to place on the home, including the parties' Rule 8.05 financial statements and the closing disclosure from the sale of the marital property. The marital home was sold in March 2020, and the chancellor awarded Shannon the entire amount of home equity, $203,711.80. The chancellor chose to use the actual figure from the closing disclosure instead of the figures listed in the parties' Rule 8.05 financial statements or appraisals. It was within the chancellor's discretion to use the actual sale figure, and we find no abuse of discretion in the chancellor's determination. *See Marter*, 95 So. 3d at 739 (¶20) ("A chancery court's findings on valuation may be accomplished by adopting the values cited in the parties' 8.05 financial

23

disclosures, in the testimony, or in other evidence."); *see also Byrd v. Byrd*, 100 So. 3d 443, 449 (¶16) (Miss. 2012) ("The chancellor was presented [an appraisal value and a purchase price] in determining the correct value to place on the home. The chancellor chose the purchase price based on his factual findings, and we find no abuse of discretion in the chancellor's valuation of the Duncan residence.").

### iv.    Cameron's Creek Properties

¶62.    Shannon argues that Cameron's Creek Properties LLC should have been separately valued by the Koerber Report. She claims that Koerber's failure to value the business separately resulted in a loss of equity to her.

¶63.    Cameron's Creek Properties owned 183 acres adjacent to the marital property on Airport Road. A line of credit secured the 183 acres. The 183 acres were secured in the amount of $422,629, which was included in the Case Land Company business valuation. According to Shannon, to calculate the equity in Cameron's Creek Properties, the chancellor should use the values presented in Koerber's report giving the 183 acres a value of $818,520, minus the $422,629 balance owed on the line of credit, resulting in an asset value of $395, 891.

¶64.    First, we must note that the $818,520 value used by Shannon from the Koerber Report is the "book value" for the property, not the "estimate fair market value" used by the chancellor. Second, for valuation purposes, testimony shows that Cameron's Creek Properties was considered and accounted for as an asset of its parent company, Case Land Company. "[T]he foundational step to make an equitable distribution of marital assets is to

24

determine the value of those assets based on competent proof." *Williams v. Williams*, 303 So. 3d 824, 833 (¶35) (Miss. Ct. App. 2020) (quoting *Dunaway v. Dunaway*, 749 So. 2d 1112, 1118 (¶14) (Miss. Ct. App. 1999)). "The valuation of the property is a question of fact." *Id*. (quoting *Messer v. Messer*, 850 So. 2d 161, 170 (¶42) (Miss. Ct. App. 2003)). Furthermore, "the chancellor has sole authority to assess both the credibility and weight of witness testimony." *Id*. (quoting *Culumber v. Culumber*, 261 So. 3d 1142, 1150 (¶24) (Miss. Ct. App. 2018)).

¶65.    Here, the chancellor heard testimony from both Koerber and Bivins regarding their valuation of the parties' property. The chancellor chose to accept the valuations in Koerber's report, which included the assets of Cameron's Creek Properties under its parent company's business valuation. We find that the chancellor did not abuse his discretion in not separately valuing Cameron's Creek Properties.

### Hearing on Amendments to Equitable Distribution

¶66.    Shannon asserts that these miscalculations warrant reversal for a correct calculation of the marital assets as of the line of demarcation selected by the chancellor. To rectify mathematical errors within final judgments, one can remand for recalculation or "disregard[] the computation error and substitut[e] the correct sum for purposes of our analysis." *Wildman v. Wildman*, 301 So. 3d 787, 793- 94 (¶9) (Miss. Ct. App. 2020) (quoting *Williams v. Williams*, 129 So. 3d 233, 240 (¶24) (Miss. Ct. App. 2013)). In *Williams*, this Court held that "while there are obvious mathematical errors as to the total values attributed [to] each party's share of the former marital estate, they cancel each other out and result in distributions not

materially deviating so as to require reversal of the chancellor." *Williams*, 129 So. 3d at 240 (¶24).

¶67. The miscalculations pointed out by Shannon are not of such a material deviation from the distribution ordered that cannot be rectified on appeal. *See Wildman*, 301 So. 3d at 793 (¶9); *see also Williams*, 129 So. 3d at 240 (¶24). Therefore, we address the computation error by substituting the correct sums. The chancellor found that the value of the parties' marital assets totaled $832,013. Based on the above analysis, the value of the parties' marital assets is $901,762. Shannon's and Daniel's marital assets total $450,881 each. Shannon is entitled to an additional $34,874.50. This Court will use these totals in the analysis regarding the appropriateness of an alimony award.

¶68. In the chancellor's bench ruling, the chancellor gave Daniel certain timelines for payment of sums to Shannon. This opinion does not alter those previously adjudicated payments. Daniel shall pay Shannon the additional $34,874.50 before December 31, 2022.

### III.   Alimony

¶69. Shannon next alleges that the chancellor committed manifest error by failing to apply the *Armstong* factors and failing to make a factual analysis on the record. Shannon argues that the case should be reversed and remanded so that the chancellor can make specific factual findings as to why he denied permanent alimony.

¶70. "On appeal, this Court will not reverse the chancellor's decision regarding an award of alimony unless it finds that the decision was manifestly erroneous or against the overwhelming weight of the evidence." *Warren v. Rhea*, 318 So. 3d 1187, 1191 (¶23) (Miss.

Ct. App. 2021) (internal quotation marks omitted) (quoting *Turnley v. Turnley*, 726 So. 2d 1258, 1265 (¶23) (Miss. Ct. App. 1998)). To aid courts in awarding alimony, the supreme court has established a number of factors. *Id*. at (¶24) (citing *Armstong*, 618 So. 2d at 1280). However, "the chancellor is not required to analyze each *Armstong* factor individually in his opinion, but is required to view the overall combination of the factors as a whole, opting to address individual factors at his discretion." *Id*. (quoting *Blalack v. Blalack*, 938 So. 2d 909, 912 (¶7) (Miss. Ct. App. 2006). "When the chancellor fails to address all [*Armstong*] factors on-the-record, we are not required to remand the case, and should not, so long as all facts are available to us so as to allow an equitable determination to be made." *Id*. (quoting *Roberson v. Roberson*, 949 So. 2d 866, 869 (¶6) (Miss. Ct. App. 2007)).

¶71.   There was adequate information in the record in this case for us to determine that an equitable determination was made. In his bench opinion, when discussing the issue of alimony, the chancellor addressed his considerations of the parties' expenses, the length of the marriage, the children's custodial arrangement, and the parties' income. Additionally, the incorporated bench opinion discussed the parties' earning capacities, their standards of living, and their respective tax obligations. Thus, we find no merit in Shannon's argument asserting that the chancellor failed to adequately weigh each *Armstrong* factor.

¶72.   In regard to the type of alimony Shannon argues she is entitled to, we note that permanent periodic alimony serves an important purpose as a "substitute for the marital-support obligation." *Wilderman*, 301So. 3d at 796 (¶18) (quoting *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011)). It is well settled that

[t]he award of permanent periodic alimony arises from the duty of the husband to support his wife. We also have said that the husband is required to support his wife in the manner to which she has become accustomed, to the extent of his ability to pay. To update our language: Consistent with *Armstrong*, a financially independent spouse may be required to support the financially dependent spouse in a manner in which the dependent spouse was supported during the marriage, subject to a material change in circumstances.

*Serio v. Serio*, 203 So. 3d 24, 30 (¶17) (Miss. Ct. App. 2016) (quoting *Rogillio*, 57 So. 3d at 1250 (¶11)). On the other hand,

[r]ehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home. Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient. [It] is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim.

*Id*. (quoting *Lauro v. Lauro*, 847 So. 2d 843, 849 (¶15) (Miss. 2003)).

¶73. With regard to the chancellor's refusal of a permanent alimony award, we also find the chancellor did not commit manifest error. Shannon argues that the evidence presented at trial favors a permanent alimony award. In determining that a permanent alimony award was improper, the chancellor stated:

There are other names but the most commonly used in guiding chancellors in awarding alimony are the Armstrong factors set forth in Armstrong versus Armstrong 618 Southern 2nd 1278. This Court has considered the income and expenses by both testimony and the 8.05 financial declarations and the needs of the parties in this matter.

The Court has considered the health and earning capacity. Both have some minor health issues, taking various drugs for anxiety and depression. Daniel clearly has a greater earning capacity. Shannon says she's seeking to further her education. The marriage is 14 years in length, but the divorce has been pending for at least the last year and a half. The Court's considered the obligation of assets and has considered the testimony, the expert valuations, the 805s, and the financial statements that have been entered. The Court has considered the custodial arrangement of the children, which will be discussed

momentarily, that both of the parties are in their early 40s, 40 or 41 years of age. The Court has considered the standard of living during the marriage, which was certainly above average while they were together, now average at best. The Court has considered the tax consequences concerning - - excuse me - - considering the changes in adjusted gross income taxability and the taxability of the receipt of alimony based upon the recent President Trump laws that have been put in place. The Court has considered default and misconduct, dissipation of assets, and there are no other equitable factors. Upon consideration of these factors, the record as a whole and the totality of the circumstances and the equitable distribution in this case, the Court finds that Shannon is not entitled to permanent periodic alimony. The Court does find that she is entitled to rehabilitative alimony in the amount of $2,500 per month for four years to transition her through her college efforts if she so desires to pursue that.

¶74. Although the chancellor did not provide a more detailed explanation of the reason to deny an award of permanent periodic alimony, our law recognizes that a chancellor "enjoys wide discretion in fashioning the financial aspects of the dissolution of a marriage" and will only be reversed on appeal if he abused that discretion. *Avery v. Avery*, 864 So. 2d 1054, 1056 (¶9) (Miss. Ct. App. 2004). We are of the opinion that the findings were sufficient to support the denial of permanent alimony award.

¶75. Shannon also argues that the chancellor erred in awarding her only $2,500 per month. The purpose of rehabilitative alimony is to assist the recipient in improving her condition "without becoming destitute in the interim." *Hubbard v. Hubbard*, 656 So. 2d 124, 130 (Miss. 1995). Rehabilitative alimony "is not intended as an equalizer between the parties" nor is it meant to put the recipient in a position equivalent to that enjoyed before the divorce. *Id*. Rather, achieving the latter goal is more properly the purpose of permanent alimony. *See generally Jenkins v. Jenkins*, 278 So. 2d 446, 449-50 (Miss. 1973).

¶76. The chancellor's award of sixty months of alimony equals a total of $120,000 to

transition her through her college endeavors if she so desired to pursue that option. Shannon's argument that this amount is inadequate should not be evaluated just by looking at the one award, but at all awards. Although the chancellor in this case did not address its analysis of the *Armstrong* factors point by point, it is evident that the court considered all applicable factors in the judgment. The court took into account the length of the marriage and the differences in the parties' incomes. The court also factored in the misconduct of both parties. When also considering that Daniel was awarded custody of the children and the chancellor did not order Shannon to pay child support during her period of rehabilitative alimony or until such time as she gains employment, we do not find error in the chancellor's determination as to alimony.

¶77.    After a review of the chancellor's judgment, we cannot say that the court abused its discretion, was manifestly wrong, clearly erred, or applied an erroneous legal standard. The award of rehabilitative alimony is affirmed.

## CONCLUSION

¶78.    We reverse the chancery court's ruling in part and render judgment as to the error in the calculation of equitable distribution and award an additional $34,874.50 to Shannon. Because we find substantial evidence supported the chancellor's findings as to child custody, other equitable distribution, and alimony, we affirm the chancellor's judgment in part.

¶79.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

   **BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., AND WESTBROOKS, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

30